## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RICARDO CLARK | ) | |
| 13905 Edsall St. | ) | |
| Upper Marlboro, MD 20772 | ) | |
| | ) | |
| MELISSA TURNER | ) | |
| 11131 Southport Pl. | ) | Case No.: _____ |
| White Plains, MD 20695 | ) | |
| | ) | |
| MICHAEL TIMMONS | ) | |
| 5310 Atherstone Tr. | ) | |
| Upper Marlboro, MD 20772 | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| VANCE PITTS, JR. | ) | |
| 5215 Banks Place, NE | ) | |
| Washington, DC 20019 | ) | |
| | ) | |
| STEPHEN TURNER | ) | |
| 1801 Chapman Ave., #194 | ) | |
| Rockville, MD 20852 | ) | |
| | ) | |
| On behalf of themselves and all | ) | |
| similarly situated individuals, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |
| Serve: | ) | |
| Brian Schwalb | ) | |
| Office of the Attorney General, | ) | |
| 400 6th St. NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| Office of the Mayor | ) | |
| 1350 Pennsylvania Ave. NW | ) | |
| Washington, DC 20004 | ) | |

_____)

1

**COMPLAINT**

Comes now Plaintiffs, ***Ricardo Clark***, ***Melissa Turner***, ***Michael Timmons***, ***Vance Pitts, Jr.,*** *and* ***Stephen Turner*** (hereinafter collectively "Plaintiffs" or "Class Plaintiffs") on behalf of themselves and all others similarly situated, by and through undersigned counsel, with their Complaint against the District of Columbia Fire and Emergency Services (hereinafter "Defendant" or "DCFEMS"), and state as follows:

**INTRODUCTION**

In the years prior to the1980's, fire suppression (hereinafter "firefighting" or "the fire department" or "the fire service") was a separate department, with a separate budget than the ambulance or Emergency Medical Services (hereinafter "EMS"). Back then, firefighters were predominantly white and overwhelmingly male. EMS, which was broken down into Emergency Medical Technicians (hereinafter "EMTs") and Paramedics, was predominantly Black, and had substantially more women than the fire department. As is and was typical, the more male and white firefighter population was better compensated than the EMS services, most especially in terms of retirement benefits.

For purposes of this case, it is important to understand that a *defined contribution* retirement plan caps benefits in relationship to what the beneficiary contributed, similar to a 401(k) plan, while a *defined benefit* plan pays out lifetime benefits once it is fully vested, no matter how long the recipient might live. Thus, a defined benefit plan is far more advantageous to the recipient. In a bygone era, all of DC government employees were part of a defined benefit pension plan, which was eventually converted to a defined contribution plan to save money. Three groups were excepted from this change, largely due to the political power of their unions: teachers, firefighters and police officers. EMS services were not considered a part of firefighting, and were certainly not treated as

2

equally valuable to the city as firefighting, so EMS employees were moved to the city employee defined contribution plan.[1]

At some point in the late 1990's, it became clear that the actual demand for emergency responders was skewing heavily towards EMS services (i.e., car accidents, medical emergencies), because building codes, technology and fire retardant materials were making structural fires less frequent. This resulted in reduced work for the predominantly white and male firefighter cadre, and in turn, a reduction in their headcount. For reasons that will be developed more fully below, in 2006, Defendant made the decision to fully merge together the firefighting and EMS services, to combine the budgets, and have a unified service that could address "all hazards."

Specifically, the intent was for all first responders to have firefighting and EMT or Paramedic training, so that they could be used for a wider variety of issues. But the merger of the two entities was neither simple nor smooth. As an initial matter, the two entities were represented by different unions, the firefighters being represented by International Association of Fire Fighters (IAFF), Local 36 (hereinafter "Local 36"), and the EMS employees being represented by American Federation of Government Employees (AFGE), Local 3721 (hereinafter "Local 3721"). That difference meant that collective bargaining was done separately for each group. Not surprisingly, the predominantly white and male firefighter group fared much better at the bargaining table than the EMS group.

Secondly, while the city leadership intended for firefighters to become "all hazard" trained, it was a far more expensive and cumbersome proposition for the EMS employees to become firefighters. The training for firefighters is substantial, as are the physical demands. Conversely, some people who wish to fight fires, do not have the focus or temperament to be EMTs or

---

[1] EMS employees that began their employment in 1986 or prior, were grandfathered into and allowed to continue to participate in a federal Civil Service defined benefit pension plan.

paramedics.  But in its wisdom, city leadership decided that eventually, all firefighters would be trained in emergency medical response to some extent, and as many as possible as full EMT's or paramedics.  They also planned that eventually all EMS employed EMTs, and paramedics would become firefighters.

To that end, the City Council passed the Paramedic and Emergency Medical Technician Lateral Transfer to Firefighting Amendment Act of 2001, which it amended in 2008.  *See* District of Columbia Code §5-409.01 (hereinafter "the Transfer Act").  The purpose of the Transfer Act was to outline provisions for the transfer of EMS employees into firefighting, and more specifically, from the defined contribution plan (or for those grandfathered into the old defined benefit plan), into the more generous defined benefit plan for firefighters.  It states in its preamble that its intention was:

> *To amend the Paramedic and Emergency Medical Technician Lateral Transfer to Firefighting Amendment Act of 2001 to authorize the Mayor to designate emergency medical technicians and paramedics that are not firefighters as All Hazards/Emergency Medical Services Specialists, and to require that they receive pay parity, retirement benefits, and all hazards training; and to amend section 12 of the Police and Firemen's Retirement and Disability Act to include All Hazards/Emergency Medical Services Specialists in the definition of member and to specify the retirement benefits available to transitioned employees of the Fire and Emergency Medical Services Department.*

As the Transfer Act makes clear, when an EMS service employee makes the transition to firefighter, he or she is supposed to have the amount of money in their defined contribution plan transferred over to the defined benefit plan, so that he or she can retire at approximately the same time as they would have if they had remained in the EMS service under the defined contribution plan.  The language of the operable provision is as follows:

> *"(5)(A) If an All Hazards/EMS Specialist is a participant in the defined contribution plan under section 2605(3) of the District of Columbia Government Comprehensive Merit Personnel Act of 1978, effective October 1, 1987 (D.C. Law 2-139; D.C. Official Code § 1-626.05(3)), and elects to participate in the Program [to transition to firefighter], all of the employee's interest in contributions and earnings under the defined contribution plan shall be transferred from the defined contribution plan to the District of Columbia Police Officers and Fire Fighters'*

4

*Retirement Fund in accordance with section 12(c)(9)(B)(ii) or (iii) of the Policemen and Firemen's Retirement and Disability Act, approved September 1, 1916 (39 Stat. 718; D.C. Official Code § 5-704(i)(2)(B) or (C)). Upon such transfer of funds, the All Hazard(s)/EMS Specialist shall cease to be a participant in or have an account under the defined contribution plan.*

The statute went so far as to amend the actual plan documents of the pension fund to make clear that transferring EMS employees were to be vested retroactive to the beginning of their service in EMS.

*(9)(A) Any member who is an officer or member of the District of Columbia Fire and Emergency Medical Services Department who was transferred pursuant to the Paramedic and Emergency Medical Technician Lateral Transfer to Firefighting Amendment Act of 2001, effective October 3, 2001 (D.C. Law 14-28; D.C. Official Code § 5-409.01), and who elects to, shall be covered by the Police Officers and Fire Fighters' Retirement Program established under the Police Officers, Fire Fighters, and Teachers Retirement Benefit Replacement Plan Act of 1998, effective September 18, 1998 (D.C. Law 12-152; D.C. Official Code § 1-901.01 et seq.)("Program"), <u>and shall receive credit for prior years of service within the District of Columbia Fire and Emergency Medical Services Department. Members who elect coverage under this subsection shall receive credit for prior service, make deposits to and receive benefits under the Program as provided in subparagraph (B) of this section.</u>*

Not only did DC law make this clear, but on at least one occasion, the City Council, with efforts spearheaded by Councilman Phil Mendelson, appropriated funds to ensure that EMS service employees would have a proper retirement in the defined benefit plan, and held hearings in December of 2010 to ensure that the DCFEMS was complying with the law, and transferring funds appropriately.

However, it bears repeating that the overwhelming majority of EMS service employees were African American, and many were female, and as such they were simply not valued by the Fire Chiefs at the time. So when it came to spending money, the Fire Chiefs spent on engines and other things, rather than on funding pensions. It is unclear what exactly was done in terms of appropriations for the transfer into the defined benefit plan, but what is known at this time is that

Defendant *did not appropriately fund* the defined benefit plan for transferring EMS service employees.

Plaintiffs in this case are five African American firefighters, who completed all the training to transfer from being single role EMTs or paramedics, to being dual role "all hazard" firefighters, and part of Local 36. They all transferred between 2006 and 2017, and they all had substantial time and money invested in the defined contribution plan when they transferred. Importantly, not only did Plaintiffs rely on the law, they relied on written and verbal assurances from Defendant that upon transferring to the firefighter function, they would get credited for the time they served the city as EMTs and/or paramedics, towards their retirement *in the defined benefit plan*.

By both word and deed, Defendant made clear that Plaintiffs would maintain *their seniority*, which is a term of art in the industry, upon transfer, and at no time did Defendant ever clarify or state its intention to deny transferees the full benefit and impact of their "seniority." Each Plaintiff reasonably relied on these representations in making the decision to transfer, and they were each willing to do the additional training and take on the additional risk of fighting fires, to earn the more generous benefit.

Plaintiffs are now ready to retire. Defendant, however, has decided to cavalierly renege on the contractual promises it made to Plaintiffs to induce them into transferring into the firefighting function. Specifically, Defendant is now taking the positions that: a) the money in the defined contribution plan did not, or will not, transfer over to the defined benefit plan, b) the appropriations from the City Council were not, or did not need to be used to fund their pensions, and c) that Plaintiffs will now have to work *decades more* than their colleagues to earn the same benefit, retire now with essentially nothing, or pay hundreds of thousands of dollars out of their own pockets to fund their own retirements.

Plaintiffs bring this action on behalf of themselves and those similarly situated, to enforce their rights under District of Columbia Code §5-409.01, to enforce the written contract between themselves and Defendant, and to pursue any quasi-contract and/or tort claims for the conversion of funds that were appropriated for their earned benefits.  Specifically, Plaintiffs seek an ORDER from the Court mandating that Defendant live up to its statutory and contractual obligations to Plaintiffs, and fully fund the defined benefit plan for each of them.  Plaintiffs also bring an action pursuant to 42 U.S.C. § 1981 via § 1983, alleging that Defendant, intentionally and with malice, chose to breach its obligations to Plaintiffs because of their race, African American.

Plaintiff Melissa Turner also brings claims pursuant to Title VII of the Civil Rights Act of 1967, 42 U.S.C. 2000(e) and the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et seq.,* asserting that she was denied seniority credit that would have allowed her to be promoted to Sergeant, because of her race and gender.

As a direct and proximate cause of the decisions made by the Mayor, the City Council, and the Fire Chiefs, up to and including Chief John Donnelly (hereinafter "Chief Donnelly"), the current Fire Chief, Plaintiffs have been divested of their earned benefits, and have suffered from the mental and emotional anguish of being discriminated against because of their race.  Plaintiffs bring this action seeking compensatory damages, costs, fees, interest and attorney's fees of not less than **$100,000,000.00**.

## **PARTIES**

1.      Plaintiff Ricardo Clark is an African American male, and resident of Maryland.  He was employed by the EMS service from 1989 to 2016, first as an EMT, and then as a Paramedic.  He became a firefighter/paramedic in 2016 and is still employed in that role.  He currently has *34 years of service* to the District of Columbia.

2.      Plaintiff Melissa Turner is an African American female.  She is a resident of Maryland.  She was first employed in the EMS service in 2003.  She became a firefighter/paramedic in 2016 and is still employed in that role.  She currently has _20 years of service_ to the District of Columbia.

3.      Plaintiff Vance Pitts is an African American male.  He is a resident of the District of Columbia.  He was employed by the EMS service from 1993 to 2017, when he transitioned to be a firefighter/EMT.  He currently has _30 years of service_ to the District of Columbia.

4.      Plaintiff Michael Timmons is an African American male and resident of the state of Maryland. He was first hired as a paramedic in 1996.  He transitioned to be a firefighter/paramedic Lieutenant in 2009.  He currently has _27 years of service_ to the District of Columbia.

5.      Plaintiff Stephen Turner is an African American male, and a resident of the state of Maryland.  He was first employed as an EMT in the EMS service in 1989.  After a break in service, he transitioned to the firefighting service in 2006.  He has _33 years of service_ to the District of Columbia.

### JURISDICTION AND VENUE

6.      This Court enjoys federal question jurisdiction over the claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, _et seq.,_ ('Title VII'), and the Civil Rights Act of 1866, 42 U.S.C. § 1981, by way and through 42 U.S.C. § 1983.  This Court enjoys supplemental jurisdiction over Plaintiffs' state contract and common law claims, and claims pursuant to the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 _et seq._

7.      Venue is proper in this Court because all acts and omissions in controversy took place in the District of Columbia.

### FACTS RELEVANT TO ALL PLAINTIFFS

8.      In the late-1980s, DC FEMS was still a heavily white male institution that strongly resisted

integration by African Americans and women.

9.    Plaintiffs Clark and S. Turner were part of a fire cadet class in 1989 that had 22 African American male candidates.

10.    Of the 22, 11 were kicked out for fabricated and nonsensical reasons.  This caused such a political uproar that eventually, DC fire was forced to try to remediate some of its racism issues, but as can be seen herein, it still has a long way to go.

11.    Because the enterprise was so rife with racism and sexism, for most African Americans and women, it was not a viable place to work.  That is precisely why so many chose to be EMTs and paramedics instead, which is what Plaintiffs Clark and S. Turner did.

12.    Unlike DC fire which was predominantly white and male, EMS was predominantly Black, and it integrated women far sooner and more readily.

13.    Even though there were substantially more calls for EMS services than for firefighting, because of the demographics of the firefighter union, and its political clout, the firefighters were always paid better and received substantially better benefits than the EMS.

14.    Prior to 1992, Dr. Robert Bass (hereinafter "Dr. Bass") was the director of what was called the DC Emergency Ambulance Bureau (hereinafter "EAB"), and reported directly to the Mayor, who at that time was Sharon Pratt Kelly.

15.    In 1992, DC Fire changed its name to DC Fire and Emergency Medical Services, but the two services did not actually merge at that time.

16.    Dr. Bass and several others opposed the merger of fire and EMS because they worried that the fire chiefs would take care of firefighters only, and would leave EMS services depleted and underpaid.

17.    In 1993, Dr. Bass left his post, and for a while the EAB worked under the license of the DC

Department of Health (hereinafter "DOH").

18.     During the time that the EAB Medical Director role was vacant, DC Fire took control of the EAB budget, and DC Fire started to truly subsume emergency services.

19.     By the year 2000, Fire Chief Ronnie Few (hereinafter "Chief Few") was Chief of all of Fire and EMS, with an Assistant Chief for Emergency Services reporting directly to him.  No longer was EMS its own stand-alone department or bureau.

20.     There were several issues with Chief Few's tenure, but he had "successfully" presided over the merger of fire and EMS services in August, GA, and was ostensibly brought to DC to do the same thing.

21.     Chief Few was immediately embroiled in controversy.  In August of 2000, DCFEMS was forced to settle a lawsuit because the bigotry and homophobia of some of its employees caused a transgender woman to die after a car crash. The employees involved were accused of cavalier disregard for her life.

22.     Also, in June of 2001, it was revealed that DCFEMS was encouraging wealthy white citizens of Northwest DC to call Bethesda or Chevy Chase fire and rescue when they needed services, which was the worst kind of indictment of DCFEMS leadership, and also revelatory of the profound racism that permeated the institution.

23.     Concomitantly, DCFEMS was plagued with aging and unreliable equipment, which was costly to maintain and even more costly to replace.  Thus the fire chiefs were scrambling to find appropriations to modernize engines and firefighting equipment.

24.     Chief Few resigned in 2002.  Although EMS was directly under the control of the Fire Chief, it was still functionally separate from the firefighting service, and the integration of services was not going well.

25.     By that time it was also obvious that the demand for firefighting services in the city had decreased dramatically, and the demand for EMS services had skyrocketed.  According to the Washington Post, in 2002 there were fewer than 100 fire alarms per month, but 8,000 to 9,000 calls for medical services. *See Farenthold, David A., "Ambulance Service Short of Personnel,"* The Washington Post, September 16, 2002.

26.     Plaintiffs assert that Chief Few and his successor, Adrian Thompson (hereinafter "Chief Thompson"), were hyper focused on keeping headcount of fire fighters, and in that context, opted to train firefighters as EMTs and paramedics to justify their salaries and to keep their jobs.

27.     What they were not concerned with was making sure that the people who were already doing the incredibly important EMS job, were being treated fairly.

28.     There was thus a plan to merge the two functions and have the entire group be "all hazards" emergency responders.

29.     One of the principal and main issues slowing down the integration involved trying to merge people who were in a defined contribution plan, into a defined benefit plan.

30.     In 2001, the D.C. City council passed legislation to govern and facilitate the merging of EMS personnel into the firefighting service.  *See* District of Columbia Code §5-409.01, *et seq*.

31.     Despite the intention of the City Council and the terms of the law, the fire chiefs and fire union resisted the integration.  Plaintiffs aver that the resistance was based on a culture of racism and sexism, and a rejection of allowing African Americans and women into leadership roles in the fire service.

32.     Chief Thompson presided over this tumultuous era until 2006, but during his tenure, a great deal more emphasis was placed on boosting the morale of firefighters and improving firefighting, than on addressing the needs of EMS services.

33.    Chief Thompson was successful in getting a number of engines upgraded, but failed to address serious systemic racism and sexism issues at DCFEMS.

34.    More importantly, Chief Thompson's focus on firefighting left serious shortages in EMS personnel.  In one study, two-thirds of all days examined had a fifth of all ambulances out of operation due to staffing shortages. *See Cella, Matthew, "Report Hits EMS on Service, Staffing,"* The Washington Times, January 25, 2003.

35.    In 2006, a well-known journalist, David Rosenbaum (hereinafter Mr. Rosenbaum"), died after being assaulted because his symptoms of head trauma were misdiagnosed as drunkenness, and because the Emergency Room physician also did not act with alacrity.

36.    Mr. Rosenbaum's death was widely publicized, and quickly followed by a lawsuit filed by his family, seeking 20 million dollars.

37.    As a result of the Rosenbaum incident, Chief Thompson decided to implement a plan to truly merge the fire and EMS services into a single unit.

38.    Some firefighters were trained into limited emergency care (but not at the level of EMTs). These EMS trained firefighters were scheduled to fill in staffing gaps in EMS services.

39.    There is a substantial difference between EMT and paramedic certifications.  EMT certification is for the provision of basic first aid in emergency situations, with a focus on stopping bleeding, and keeping a patient breathing until they can be transported to a hospital.

40.    They are often used for patient transfers and dealing with other non-life-threatening injuries and situations.  It takes approximately six weeks of training to obtain an EMT certification.

41.    By contrast, paramedics have advanced medical training that allows for much more sophisticated life sustaining treatment.

42.    Paramedics are able to administer pain medications and other potent drugs.  It takes three

semesters of intense study to become a paramedic, which usually takes more than a year.

43.    Paramedics are required to take several advanced and ongoing training classes to maintain their certifications.  They are deployed to more serious accidents and are used to transfer patients in precarious condition.

44.    As a general rule, firefighters who have and maintain a paramedic certification, and who meet the continuing education and recertification requirements, are entitled to a 15% premium to their base pay.

45.    Chief Thompson placed a paramedic at each fire station that had the highest EMS calls, which amounted to 18 of the city's 24 fire stations.  Response times fell by three minutes, which constituted an improvement.  *See Cella, Matthew, "DC Fire /EMS Chief Calls Tenure a Success Despite Mistakes,"* the Washington Times, January 4, 2007.

46.    At the end of 2006, Mayor Adrian Fenty (hereinafter "Mayor Fenty") won the Democratic nomination for Mayor, and promised to replace Thompson as Fire Chief.  He also promised to undo the merger of fire and emergency services, but never actually fulfilled that promise.

47.    Chief Thompson resigned in December of 2006, and was replaced by Acting Fire Chief Brian Lee.

48.    In March of 2007, Mayor Fenty appointed Dennis L. Rubin as Acting Fire Chief, who was confirmed in the permanent role in May of 2007.

49.    That same year, the Rosenbaum family decided to forego their lawsuit in exchange for systematic changes at DCFEMS, and as a result of that decision, an investigative panel was created to give recommendation to improve EMS services (hereinafter "the Rosenbaum Taskforce Recommendations").

50.    The Rosenbaum Taskforce Recommendations were published at the end of 2007, and it

caused several changes to take place in the EMS service, including the creation of a Captain-level supervisory position to help manage and improve field operations.

51.    In 2008, the merger of services was still taking place haltingly, and was running into several problems, including issues with transferring EMS personnel into the defined benefit pension plan.

52.    To clarify the issue, in 2008, the City Council made amendments to District of Columbia Code §5-409.01, *et seq.*, that included the following language:

> *"(5)(A) If an All Hazards/EMS Specialist is a participant in the defined contribution plan under section 2605(3) of the District of Columbia Government Comprehensive Merit Personnel Act of 1978, effective October 1, 1987 (D.C. Law 2-139; D.C. Official Code § 1-626.05(3)), and elects to participate in the Program [the Defined Benefit Plan], all of the employee's interest in contributions and earnings under the defined contribution plan shall be transferred from the defined contribution plan to the District of Columbia Police Officers and Fire Fighters' Retirement Fund in accordance with section 12(c)(9)(B)(ii) or (iii) of the Policemen and Firemen's Retirement and Disability Act, approved September 1, 1916 (39 Stat. 718; D.C. Official Code § 5-704(i)(2)(B) or (C)). Upon such transfer of funds, the All Hazard(s)/EMS Specialist shall cease to be a participant in or have an account under the defined contribution plan.*

53.    Plaintiffs assert that the only people that this provision could apply to are EMS personnel who were members of Local 3721, and part of the defined contribution plan, as persons who were hired directly into the firefighter services, no matter how many hazards they could ostensibly handle, were *never part of a defined contribution plan.*

54.    In 2009 and 2010, DCFEMS was slammed with yet another controversy because it had seriously overspent its budge on overtime.  Chief Rubin claimed that the overtime was necessary because D.C. was in a hiring freeze in 2008 (due to the economic downturn).

55.    At the same time, Chief Rubin and/or his agents were actively encouraging EMS employees, who were predominantly Black, to convert to being firefighters.

56.    In October of 2010, however, thirty (30) African American firefighters filed suit alleging that

a pattern and practice of race discrimination, disparate treatment and a hostile work environment at DCFEMS.

57.    It was clear by that time that despite the efforts of Local 3721, it was not able to move any Fire Chief to abide by legislation passed by the City Council to create wage and benefit parity for EMS employees.

58.    Furthermore, as stated by then former Chief Thompson, by 2010 it was clear that the merger of the two services was a failure.

59.    He publicly asserted that the failure of integration was due in part to racial issues, noting that firefighters are primarily white and EMS personnel mostly African American, and further that white firefighters have little respect for the mostly Black and poor people they provide services to. *See Cella, Matthew, "Ex-Chief Regrets D.C. Fire Merger with EMS,"* The Washington Times, March 12, 2010.

60.    In August of 2010, Mayor Fenty was defeated in the primary, and incoming Mayor Vincent Gray (hereinafter "Mayor Gray") indicated that he would appoint Kenneth Ellerbe (hereinafter "Chief Ellerbe") to be the new Fire Chief because they were longtime friends.

61.    On or about December 1, 2010, Councilman Phil Mendelson held a hearing of the Judiciary Committee to find out what was happening with the merger of services, and repeated that the council had appropriated funds to ensure that EMS personnel could transfer into the firefighter defined benefit plan.

62.    At that hearing, the DCFEMS representatives evaded the question, and Councilman Mendelson eventually moved on.

63.    Chief Ellerbe was appointed in January of 2011, and came in on a wave of controversy, including having been accused of serious sexual harassment during his short stint as Fire Chief in

Sarasota, FL.

64.     His appointment was opposed by Local 36 and the D.C. Federation of Citizens Associations. However, Mayor Gray was not moved and installed Ellerbe.

65.     Throughout 2012 and 2013, DCFEMS was mired in staffing and scheduling controversies, some of which were related to Chief Ellerbe's plans to reduce EMS services during the overnight hours, and some of which were related to the ever-present staffing shortage at the EMS service.

66.     Also, the Rosenbaum Taskforce Recommendation that all EMS paramedics be firefighter trained made it very difficult to hire new paramedics.

67.     By 2012, the merger that was supposed to cross train all of Local 3721 to be firefighters had converted less than half of the paramedics.

68.     Plaintiffs assert that had Defendant complied with the law, and given its EMS staff pay parity and access to the defined benefit plan, the EMS positions would have been far easier to fill.

69.     In short, from 2012 to 2016, DCFEMS was under immense pressure to get the EMS paramedics and EMTs trained to be firefighters, while at the same time, Local 36 was actively undermining the process, and nothing was done to abate the racial tensions between the two groups.

70.     In 2013, Chief Ellerbe decided to abandon the cross-training requirement in order to fill desperately needed paramedic positions.

71.     This move infuriated Local 36, because it meant that people were going to be hired as paramedics into Local 3721.   It also angered local associations who had embraced the recommendations of the Rosenbaum Taskforce.

72.     Chief Ellerbe's tenure ended when Mayor Gray lost the primary for his reelection, and both primary winners announced that they would replace him.

73.     In January of 2015, Mayor Muriel Bowser (hereinafter "Mayor Bowser"), took over, and

appointed Gregory Dean (hereinafter "Chief Dean") from Seattle, WA to be the new Fire Chief. He
was specifically tasked with turning around a department that Mayor Bowser viewed as failing.

74.    Early in his tenure, as a salvo to Local 36, Chief Dean recommitted to implementing the
Rosenbaum Taskforce Recommendations, and stopped hiring paramedics that were not firefighters.

75.    While this eased tensions internally, it exacerbated and extended the perpetual and ongoing
paramedic staffing shortage.

76.    In 2015, Chief Dean wrote a Special Order (hereinafter "the 2015 SO") for the express
purpose of incentivizing EMS paramedics to become firefighter trained, and that document clearly
outlined that in transitioning, EMS personnel would retain their seniority and would money in their
defined contribution plan transferred to the defined benefit plan.

77.    This document was both instructive, but also contractual, as those who relied on it made
decisions about their futures based on its terms.

78.    It is important to note that the term "seniority" is a term of art in the context of a union shop,
and had specific meaning to Plaintiffs.

79.    Seniority defines an employee's status, not just vis-à-vis their employer (tenure), but also vis-
à-vis their fellow employees (rank).

80.    In every context in which the term "seniority" was ever used at DCFEMS, it carried both of
these meanings.

81.    Thus, when the 2015 SO stated that transferring EMS employees would maintain their
"seniority," Plaintiffs believed, and had every right to believe, that the word would have and carry
its meaning as it always had at DCFEMS.

82.    This means that when Plaintiffs transferred to firefighting, they would earn wages based on
their tenure, but also that they would be inserted into the employee list at the appropriate place for

their rank amongst other employees.

83.    Plaintiffs assert that the 2015 SO was a contractual offer, with sufficiently specific terms as to be contractually binding, and that they accepted those terms by way of transferring to the firefighter service.

84.    Plaintiffs further assert that valuable consideration in support of the contract consists of the work and effort they put into passing the firefighting academy requirements, and in the risks they agreed to take on, and did take on as firefighters.

85.    Between 2015 and 2017, all but one Plaintiffs transferred from the EMS side to the firefighter service because the merger of the services was simply not happening as intended and promised.  After years of legislation and appropriations, EMS employees were still being paid less, and were no closer to being part of the defined benefit plan.

86.    As discussed below, each Plaintiff decided to transfer to the firefighting service, and all but one had to go through the fire academy and learn how to fight fires, for the express purpose of obtaining defined benefit pension plan terms.

87.    Each Plaintiff relied on verbal and written representations made to them by management in the 2015 SO, representations made to Local 3721 and disseminated to its members, and the statutory language of District of Columbia Code §5-409.01 5(A).

88.    At no time, during the transfer of any Plaintiff, did any management employee, agent, leader or representative ever suggest or state that DCFEMS would not abide by§5-409.01 5(A), or that DCEMS would deny Plaintiffs any aspect of their rights according to seniority, which was a material omission.

89.    In 2020, Chief Dean retired, and Chief Donnelly took over the helm of DCFEMS.

90.    Because DC was in the middle of the pandemic, there was high demand for EMS, and there

was little bandwidth to deal with some of the longstanding issues as DCFEMS.

91.     In November of 2021, Chief Donnelly held a zoom town meeting with employees who had transferred from EMS to firefighting.

92.     At that meeting, Chief Donnelly essentially told the employees that the city was not going to spend the money to fund their retirements, and that all of them would have to serve a full 25 years in firefighting, regardless of how much time they spent in EMS, to obtain a full pension.

93.     Chief Donnelly had no explanation why the funds in the defined contribution plan were not transferred to the defined benefit fund when the employees transferred, in accordance with the law.

94.     In the presentation, Chief Donnelly used the figure $750,000 as an estimate as to what it would cost for the employees to "buy their own retirements."

95.     Chief Donnelly further stated that money that was in the defined contribution plan when they were at EMS was no longer there, and had no explanation for why it was not invested in the defined benefit plan for their benefit.

96.     Chief Donnelly had no explanation for why money that was appropriated by the City Council for their retirement benefits was not spent for that purpose.

97.     Chief Donnelly finished the meeting by stating that his decision was final, and that he had no interest in entertaining any questions or complaints about it.

98.     Defendant has now formally taken the position that because of their transfer, Plaintiffs are no longer vested in the defined contribution plan, and because they do not have 25 years in the defined benefit plan they transitioned to, they are not vested and have no entitlement to retirement benefits.

99.     Essentially, DCFEMS is taking the position that because money that was supposed to be placed in their retirement accounts years ago was not placed in their accounts, Plaintiffs, and those similarly situated, will simply be DC employees with no retirement benefits, regardless of how well

19

they have served the city, and regardless of the fact that they have fulfilled their end of the bargain when they became firefighters.

100.    As will be clarified below, the result of Defendant's position, is that Plaintiffs will have to work for upwards of 40 years to earn the benefit that every other firefighter earns in 25 years.

101.    Plaintiffs assert, on behalf of the entire class of transferee employees that Defendant either breached terms of a contractual agreement, or reneged on promises upon which Plaintiffs had every reason to rely to their own detriment.

102.    Plaintiffs, on their own behalf, further assert that Defendant made the decision to renege on its obligations towards them because of their race, African American.

## FACTS RELEVANT TO PLAINTIFF RICARDO CLARK

103.    Plaintiff Clark references and incorporates all assertions in the previous paragraphs as if fully restated herein.

104.    Plaintiff Clark is an African American male, who was first hired by DC Fire in July 1989.

105.    Plaintiff Clark began as a firefighter cadet, but immediately ran into problems because of the rampant racism in the department at the time.

106.    Of the 22 African Americans in his cadet class, Defendant attempted to fire 11 of them, which caused a political uproar and controversy.  The group large group of African Americans cadets was the result of direct intervention by Mayor Marion Barry (hereinafter "Mayor Barry"), who actively worked to desegregate the fire service.

107.    Although the fire chief at that time stated he would take steps to give African Americans opportunities, and there was political intervention to address the obvious racism, Plaintiff Clark had no desire to work in such a racially toxic environment.

108.    Instead, Plaintiff Clark opted to become an EMT, with the EMS.  He served as an EMT from 1989 to 1996.

109.    In 1996 he completed paramedic training and became certified.  He served as a paramedic in the EMS service until 2016.

110.    In late 2015, Plaintiff Clark told his superior, Lt. Robert Cooper (hereinafter "Lt. Cooper"), that he wanted to convert to the fire side in order obtain better wages and retirement benefits.

111.    Lt. Cooper told Plaintiff to hold off, because Chief Dean was going to publish a directive about converting to firefighting in the near future.

112.    Shortly thereafter, the 2015 SO was issued, stating that any single role provider who wanted to cross over to "dual role" firefighter should apply.

113.    The 2015 SO contained very specific terms, and stated that those transferring would maintain their seniority when transferring, and would not have to start as new hires.

114.    Plaintiff filled out paperwork online, and was told by Erika Evans (hereinafter "Ms. Evans") in HR, that he was accepted.

115.    Ms. Evans told Plaintiff what his pay was going to be, but informed Plaintiff that he would not get the entirety of his seniority credit, which would have caused him to earn $93,000 per year as a firefighter.  Instead, she informed Plaintiff Clark that he would earn $87,000 annually.

116.    Because $87,000 was a substantial increase in pay, Plaintiff Clark decided to accept it.

117.    Importantly, at no time did Ms. Evans ever warn or tell Plaintiff Clark that the statements in the 2015 SO about transferring the money in his retirement fund to the defined benefit plan were not going to be honored, or that in transferring, Plaintiff Clark would have to work _an additional 25 years_ to be retirement eligible.

118.    Plaintiff was assigned to a firefighter recruit class in November of 2016.

119.    Upon graduating, he was first assigned to Engine 26. In 2017 he went to Engine 31.

120.    Plaintiff has been at Engine 31 since 2017, and is still there, awaiting resolution of this case so he can retire.

## FACTS RELEVANT TO PLAINTIFF MELISSA TURNER

121.    Plaintiff M. Turner references and incorporates all assertions in the previous paragraphs as if fully restated herein.

122.    Plaintiff M. Turner was first hired by EMS in April of 2003.

123.    At the time Plaintiff M. Turner had no desire to be a firefighter because she was severely claustrophobic.

124.    She first worked as an EMT from 2003 to 2005. From 2005 to 2013, Plaintiff M. Turner was an EMT Intermediate (hereinafter "Intermediate"), which was a title that reflected advanced EMT skills, that were nevertheless short of a full paramedic certification.  The Intermediate title was phased out around 2013-2014.

125.    In 2013, Plaintiff M. Turner obtained her paramedic certification.

126.    For several years, Local 3721 was of the belief that members of their local would become part of the defined benefit pension plan, because of representations made to Local 3721 by the City Council and by DCFEMS leadership.

127.    However, for years, Local 3721 leadership engaged in negotiations and discussions that never resulted in the actual implementation of the promised merger of benefits.

128.    Plaintiff M. Turner eventually grew frustrated with the impasse, and was told that the only way she was going to get the benefits offered to firefighters was to convert to being a firefighter.

129.    At the time, several other EMS employees, including Plaintiffs Timmons and S. Turner had

made the transition to the firefighting operation, and were examples to Plaintiff M. Turner on what steps to take to make the transition.

130.    Local 3721, and the successfully transitioned firefighters discussed and shared documents from DCFEMS management with Plaintiff M. Turner and Plaintiff Clark, that reinforced their understanding of what was supposed to happen to their retirement funds when they transitioned.

131.    Also, Plaintiff M. Turner relied on the plain language of the Transition Act legislation, and representations and promises from DCFEMS HR and management, that were made to her and several other similarly situated EMS employees, that if they successfully transferred to the firefighting operation, the money in their defined contribution plan would transfer with them, and that they would be vested in the defined benefit plan retroactive to their start date at EMS.

132.    Plaintiff M. Turner had to apply to be a firefighter, go through the background process, and go through the academy to become a firefighter.

133.    In that process, Plaintiff M. Turner spoke with then Captain Spencer Hamm (hereinafter "Deputy Chief Hamm"), who was the recruiting officer, Claudia Green (hereinafter "Ms. Green") who was the assistant case manager at the Police and Fire Clinic (hereinafter "PFC"), and Erika Evans (hereinafter "Ms. Evans") who was the management liaison specialist in HR.

134.    Based on those interactions, Plaintiff's transition to the fire academy in 2017 went smoothly, with no break in her pay or seniority.

135.    Plaintiff M. Turner notes and highlights that DCFEMS gave her full seniority credit for purposes of wages when she transitioned to firefighting, which caused her to have an increase in pay when she made the transition.

136.    Given the language of the Transition Act, and the experience of those who transitioned before her, Plaintiff had no reason to believe that she would not be given seniority credit or tenure credit for

purposes of her benefits or eligibility for promotion.

137.    At no time prior to, or during her transition, did Defendant, or any of its agents ever state to Plaintiff that in transitioning, she would be starting over as a new entrant to the defined benefit plan, or that she would be treated as a new employee for promotion purposes.

138.    Plaintiff asserts that she entered into a binding contract with Defendant when she applied and was accepted as a firefighter.

139.    Plaintiff M. Turner asserts that being included in the defined benefit plan and obtaining credit in that plan for time she spent in the EMS service was the moving impetus and *sine qua non* to her decision to become a firefighter, and that such was a material term of the contract.

140.    Plaintiff M. Turner asserts that Deputy Chief Hamm, Ms. Evans or some other agent of Defendant had a legal obligation to tell her that the terms of the Transition Act would not be honored and that she would not be grandfathered into the defined benefit plan.

141.    Neither Deputy Chief Hamm, Ms. Evans nor any other agent of Defendant ever gave Plaintiff M. Turner any warning or clarification about these material terms of the contract between her and Defendant.

142.    Plaintiff M. Turner asserts that their material omission induced her into entering the contract.

143.    Plaintiff M. Turner matriculated from the fire academy and was assigned to Engine 25, which covers Southeast DC.

144.    Even though Plaintiff M. Turner transitioned to the firefighter functions, she maintained her paramedic certification.

145.    There were, however, still single role paramedics and single role EMTs in the EMS service who had not transitioned to firefighting.

146.    The Rosenbaum Taskforce suggested that there be increased supervision of EMS

24

employees while in the field, which caused DCFEMS to create the EMS Battalion Supervisor

(hereinafter "Battalion Captain") position.

147.    Single role EMS personnel were eligible to become Battalion Captains by being single role

paramedics, and testing into the role.

148.    At some point, the Battalion Captain role was opened up to firefighter/paramedics who

were part of Local 36, thus making it far more difficult for single role EMS paramedics to obtain

the role.

149.     Notably, no management role on the fire side was opened to single role EMS personnel.

Thus a disparity in promotional opportunities was created.

150.    A few years later, in response to EMS complaints that there were no promotional

opportunities, DCFEMS created the EMS Sergeant, and eventually the EMS Lieutenant role.

151.     Importantly, at the time that the EMS Sergeant, Lieutenant and Battalion Captain roles were

created, there was always a parallel promotional track of Sergeant, Lieutenant and Captain for

firefighters.

152.    In 2020, after completing the entire testing process, Plaintiff M. Turner was denied the

promotion to EMS Sergeant because she had transitioned into Local 36, and was told that the position

was only available to single role Local 3721 paramedics, which was the exact opposite of what

Defendant did for the Battalion Captain role.

153.    In 2022, Plaintiff M. Turner took the firefighter Sergeant's exam, and scored well enough to

be ranked 28th on the promotion register.

154.    It was at that time that Plaintiff M. Turner that Plaintiff was informed that she would not be

promoted at the correct time because she did not have enough seniority in the firefighting side to be

promoted, despite her years of service as an EMT and paramedic in EMS.

155.    This was the first time that Plaintiff M. Turner learned that the seniority credit that she was assured she would be given in the transition, would not apply to her promotional opportunities, which Plaintiff avers was a material term that should have been disclosed to her prior to transitioning to the firefighter function.

156.    Plaintiff M. Turner spoke directly to Deputy Chief Kisha Clemencia (hereinafter "Dpt. Chief Clemencia") and Battalion Chief John Robinson (hereinafter "Chief Robinson"), and she also filed an informal grievance.

157.    Plaintiff M. Turner also sent an email to Fire Chief Donnelly on or about September 26, 2022, complaining about the fact that she was being denied seniority credit for her time in the EMS service, in contravention with what was promised to those who transitioned from EMS to the firefighting service.  Thus, the highest level of decision maker at DCFEMS was directly involved, and instigated the decisions that are the subject of this litigation.

158.    Plaintiff M. Turner's informal grievance was referred to and heard by India Daniels (hereinafter "Ms. Daniels"), the Labor Relations Officer, who *sua sponte*, and in abrogation of the Collective Bargaining Agreement, converted Plaintiff's informal grievance into a formal third step grievance without Plaintiff's request or consent, and without allowing Plaintiff the benefit of full union representation for any of the process.

159.    Ms. Daniels then told Plaintiff that DCFEMS was simply not going to honor its obligation to give Plaintiff credit for her time in the EMS service, and that there was really nothing that Plaintiff could do about it.

160.    In doing so, Ms. Daniels quoted the District Personnel Manual (hereinafter "DPM"), which states that to be eligible for promotion, a candidate must have five years of continuous or intermittent service in the "Fire Department."

161.    It bears noting that at the time, Plaintiff had more *than 19 years of cumulative service*, and that her service on the EMS side was in the "Fire Department" as of the date that EMS was subsumed into the Fire Department in 2002.

162.    Nothing in the DPM distinguishes service in the firefighting service or the EMS service. That distinction was manufactured by Ms. Daniels, or by those who directed her.

163.    When asked about it, Ms. Daniels stated that DCFEMS follows the "intention" of the writer, rather than the plain language of the DPM, or words to that effect.

164.    Plaintiff further asserts that there is nothing in the Local 36 CBA that supports DCFEMS' interpretation of the DPM.

165.    Inasmuch as Chief Donnelly referred the matter to Ms. Daniels directly, Plaintiff asserts on information and belief, that Chief Donnelly created the distinction between firefighting service and EMS service for the express purpose of denying promotional opportunities to African American and women firefighters.

166.    Plaintiff references the demographic differences between the two historic groups in support of this assertion.

167.    On or about October 27, 2022, Plaintiff filed an EEOC charge alleging that Defendant has discriminated against her based on her race and age in denying her promotional opportunity.

168.    In doing so, Plaintiff engaged in protected activity.

169.    On or about May 26, 2023, Plaintiff received the Notice of Right to Sue (hereinafter "NRTS"), and now timely files the instant complaint.

## FACTS RELEVANT TO PLAINTIFF MICHAEL TIMMONS

170.    Plaintiff Timmons references and incorporates all assertions in the previous paragraphs as if fully restated herein.

171.    Plaintiff Timmons was first hired by EMS in June of 1996 as a paramedic.

172.    He remained in that role until 2005, when he was promoted to EMS Sergeant, and then immediately promoted to EMS Lieutenant.  He remained as an EMS Lieutenant until 2009.

173.    In 2009, Defendant informed Plaintiff Timmons that because he was a management level employee, he was not part of the bargaining unit, and that his position was being moved to the firefighting side.  Plaintiff Timmons was given no choice in that move.

174.    Plaintiff Timmons met with human resources and someone from the retirement board.   In that meeting, Defendant stated that money would be transferred to the benefit plan so that Plaintiff and those transferring to the fire side would have a full retirement in the police and fire plan.

175.    Thus, when Plaintiff Timmons transferred from the defined contribution plan to the Policemen and Firemen's Retirement Plan, he should have received credit for this entire EMS tenure.

176.    Plaintiff Timmons transferred to the fire side as a Lieutenant in August of 2009, along with 40 others.

177.    In October of 2009, a promotional exam was offered to the transferring EMS Lieutenants, and several, including Plaintiff Timmons, were promoted to Captain.

178.    Plaintiff Timmons was trained as an "all hazard" employee by going through a modified fire class.

179.    Within a few months, Plaintiff and several others who transferred realized that firefighters who were junior to them were being paid more money than they were.  Some of them filed a complaint about disparate pay.

180. Plaintiff Timmons met with Kiviet Bishop (hereinafter "Ms. Bishop"), the head of HR to discuss the matter.

181. Ms. Bishop submitted paperwork for a pay problem, obtained the approval of a chief, and the problem was corrected for Plaintiff Timmons.

182. Plaintiff Timmons believed everything was fine with his pay and retirement benefits because money was appropriated to fund his benefits.

183. However, in November of 2021, Chief Donnelly had an online town hall meeting with all of the transferee firefighters who had crossed over from the EMS service.

184. In that meeting, Chief Donnelly asserted that Defendant would not honor its obligations to Plaintiff Timmons and others, and that they would all have to serve 25 years in the defined benefit plan to earn a retirement.

185. Chief Donnelly did not give a reason why, and would not field questions about it.

186. In approximately February of 2023, Plaintiff Timmons met with Chief Donnelly to address disparate treatment of transferee EMS Captains.

187. Specifically, transferred EMS captains were not allowed to sit on disciplinary trial boards because Local 36 didn't want them there.

188. Importantly, of the 30 Captains affected by this exclusionary and discriminatory practice, 13 are Black, and 7 are female.

189. Plaintiff Timmons asserts that this practice of denying Black and female Captains from being on trial boards is racist and sexist, and without legitimate business purpose.

190. Importantly, firefighter captains who transferred over to the EMS side have no such limitations.

191. Plaintiff Timmons reiterates that Local 36 has a history of being predominantly white and

male, and that it has been, and continues to be resistant to full and equal integration of Black and female firefighters into the service.

192.    Chief Donnelly is pandering to his white male firefighters in needlessly excluding Black and female Captains from the disciplinary process.

193.    Plaintiff Timmons further asserts that Chief Donnelly's decision to divest overwhelmingly Black firefighters of their retirement benefits is also steeped in racism, and indicative of his animus.

## FACTS RELEVANT TO PLAINTIFF VANCE PITTS, JR.

194.    Plaintiff Pitts references and incorporates all assertions in the previous paragraphs as if fully restated herein.

195.    Plaintiff Pitts was hired in 1993 into the EMS service as an EMT.

196.    In 2015, Plaintiff Pitts saw and responded to the 2015 SO issued by Chief Dean, which invited personnel in the EMS service to apply to be firefighters.

197.    The 2015 SO specifically stated that transferring employees would maintain their "seniority," and earn wages according to their tenure, and it further stated that the funds from their defined contribution plans would transfer over to the defined benefit pension plan for firefighters.

198.    As a result of the 2015 SO, Plaintiff Pitts applied to be a firefighter, and though he was accepted, the 2016 candidate class was full, and he was told that he would have to wait until the next class.

199.    Plaintiff Pitts processed his paperwork to become a firefighter with Ms. Evans in HR. Importantly, at no time did Ms. Evans state or suggest that DCFEMS would not abide by the applicable law to transfer his retirement funds to the defined benefit fund, and certainly said nothing

about Plaintiff Pitts starting over from zero in any retirement plan.

200.    Had Ms. Evans stated that Plaintiff Pitts would lose his retirement benefits at that time, Plaintiff Pitts would not have opted to transfer to become a firefighter.

201.    Plaintiff Pitts was enrolled in the late 2017 candidate class, and he became a firefighter/EMT in April of 2018.

202.    Up until November 2021, Plaintiff Pitts had no reason to believe that there was any issue with his retirement.

203.    In November of 2021, Chief Donnelly held an online town hall with Plaintiff Pitts and others, in which he stated that there was no money to fund Plaintiffs' retirement benefits, and that if they wanted to retire, they would have to contribute *hundreds of the thousands of dollars* of their own money into the defined benefit plan.

204.    Essentially, Chief Donnelly took the position that Plaintiffs needed to pay the city to retire, not that the city needed to pay Plaintiffs for their service and well-earned benefits.

205.    Chief Donnelly also made clear that the decision was final, and that he had no interest in listening to anything the Plaintiffs had to say.


**FACTS RELEVANT TO PLAINTIFF STEPHEN TURNER**

206.    Plaintiff S. Turner references and incorporates all assertions in the previous paragraphs as if fully restated herein.

207.    Plaintiff S. Turner was hired by DC Fire in July of 1989 as a cadet right out of high school.

208.    At the time, Mayor Barry made a determined push to integrate DC Fire, over the vehement objection of the prevalent racist element in the rank and file and leadership of DC Fire.

209.    Plaintiff S. Turner was part of a class that contained 22 African Americans, and like Plaintiff Clark, was one of the 11 that were needlessly pushed out to appease white firefighters.

210.    Like Plaintiff Clark, Plaintiff S. Turner opted to join the EMS service as an EMT, rather than face the racially toxic work environment at the fire department.

211.    In January of 1996, Plaintiff S. Turner became a paramedic after taking courses as George Washington University.

212.    In 2003, Plaintiff S. Turner took the test to become a firefighter, and began the process to be transferred.  However, he was told that there was no place for him in the recruit class at that time.

213.    For months, Plaintiff S. Turner was given opaque reasons for why he could not transfer to being a firefighter, and he eventually opted to leave EMS.

214.     In 2004, Plaintiff S. Turner resigned to join the Prince George's County Fire Department.

215.    Plaintiff S. Turner returned to DCFEMS in September of 2005 after he was assured that he would be placed in the next firefighter class, and in January of 2006, he transitioned to firefighting.

216.    Because of a break in service, Plaintiff S. Turner opted to cash out of the defined contribution plan, and was given $42,000.

217.    When he returned, he rejoined the EMS service for several months.

218.    However, when he joined the firefighting service, he was told he would have to start as a new entrant to the plan, and was not given credit for the few months of service he had in the defined contribution plan, while his transfer was pending.

219.    Because of the decision not to credit his defined benefit account with the funds that accrued in his defined contribution account, Plaintiff S. Turner lost out on that sum's accrued interest for 17 years.

220.    Defendant's failure to abide by applicable provisions affected Plaintiff S. Turner, and like the other Plaintiffs, he asserts that Defendant's decision was unlawful and steeped in racial animus.

## DEFINITION OF THE CLASS ACTION

Plaintiffs (hereinafter "Class Plaintiffs") bring claims on behalf of themselves and all similarly situated DCFEMS employees, who were originally hired by the EMS service as EMTs or paramedics, who were participants in the defined contribution plan, and who transferred to firefighting as a result of the contractual promise and expectation that they would be fully funded into the firefighter defined benefit plan, and who are now being harmed by Defendant's contractual breach, who are currently employed, or who retired and were denied full defined benefit retirement benefits between June 1, 2020 and the present.

## CLASS CLAIMS

### COUNT I
### *(Violation of District of Columbia Code §5-409.01 et seq.)*

221.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

222.    Class Plaintiffs assert that per the District of Columbia code *§5-409.01 et seq.,* Defendant was legally bound to transfer the funds in their defined contribution plans to the defined benefit plan, and to do so in a timely way so that such funds could accumulate proper interest.

223.    Class Plaintiffs assert that to the extent that there was a shortfall of funds, the City Council appropriated funds for the purpose of fully funding Plaintiffs' retirements, Defendant was legally obligated to use the funds as intended, and to place such funds in the defined benefit fund for the putative class members.

224.    Defendant failed to do either and as a result, there are insufficient funds in the defined benefit fund for putative class members to retire with 25 years of service to the fire department.

225.    The putative class seeks damages from Defendant for the violation, and further seeks an ORDER from the Court, mandating that Defendant fully fund the defined benefit pension fund to allow all class members to retire with a full pension upon 25 years of service to DCFEMS.

### COUNT II
*(Breach of Contract)*

226.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

227.    Class Plaintiffs assert that Defendant made an offer of employment to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by written and verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO.

228.    The terms of the offer were clear and specific, and established that putative class members would be fully funded into the defined benefit pension plan, and would retain their seniority if they transferred to becoming firefighters.

229.    Putative class members accepted that offer when they actually transferred to firefighting.

230.    Putative class members provided valuable consideration for the contract when they left the defined contribution plan in which they were participating, went through firefighting training, and took on the increased risk of fighting fires when called upon.

231.    Defendant breached the terms of the contract by failing to transfer funds from the defined contribution plan to the defined benefit plan on behalf of putative class members.

232.    Defendant breached the contract when it misappropriated funds from the City Council that were intended to fund putative class member retirements.

233.    Defendant also breached the contract in November of 2021 when it told putative class members that it would not honor its obligations, and that they would have to work additional years beyond 25 years of service in the fire department to obtain a full retirement.

234.    Defendant breached the contract when it told the putative class members that they would have to contribute to the pension fund from their own financial resources to obtain a full retirement.

235.    As a direct and proximate result of Defendant's multiple breaches, putative class members have been substantially harmed by loss of the valuable benefit of a full retirement timely earned.

236.    Herein, they seek compensatory and make whole damages, including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.

## COUNT III
### *(Breach of Implied Contract)*

237.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

238.    Class Plaintiffs assert that Defendant made an offer of employment to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by written and verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO.

239.    The terms of the offer were clear and specific, and established that putative class members would be fully funded into the defined benefit pension plan, and would retain their seniority if they transferred to becoming firefighters.

240.    Putative class members accepted that offer when they actually transferred to firefighting.

241.    Putative class members provided valuable consideration for the contract when they left the defined contribution plan in which they were participating, went through firefighting training, and took on the increased risk of fighting fires when called upon.

242.    Even if there was no single written contract between the parties, an implied contract existed because Defendant made verbal representations to putative class members through its agents such as

Ms. Evans and Chief Dean, that referenced and relied upon written provision in the D.C. Code, as well as in the 2015 SO.

243.    Defendant breached the implied contract when it misappropriated funds from the City Council that were intended to fund putative class member retirements.

244.    Defendant also breached the implied contract in November of 2021 when it told putative class members that it would not honor its obligations, and that they would have to work additional years beyond 25 years of service in the fire department to obtain a full retirement.

245.    Defendant breached the implied contract when it told the putative class members that they would have to contribute to the pension fund from their own financial resources to obtain a full retirement.

246.    As a direct and proximate result of Defendant's multiple breaches, putative class members have been substantially harmed by loss of the valuable benefit of a full retirement timely earned.

247.    Herein, they seek compensatory and make whole damages, including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.


**COUNT IV**
*(Promissory Estoppel)*

248.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

249.    Class Plaintiffs assert that Defendant made an enforceable promise to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by written and verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO.

250.    The terms of the promise were clear and specific, and established that putative class members would be fully funded into the defined benefit pension plan, and would retain their seniority if they transferred to becoming firefighters.

251.    Putative class members relied to their detriment when they left the defined contribution plan in which they were participating, went through firefighting training, and took on the increased risk of fighting fires when called upon.

252.    In November of 2021, Defendant announced that it was not going to abide by its promises to the putative class.

253.    As a direct and proximate result of Defendant's actions, putative class members have been substantially harmed by loss of the valuable benefit of a full retirement timely earned.

254.    Herein, they seek compensatory and make whole damages including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.

## COUNT IV
*(Quantum Meruit and/or Unjust Enrichment*
*-- Plead in the Alternative to Contract Claims)*

255.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

256.    Class Plaintiffs assert that as a result of promises and assertions made by Defendant to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO, putative class members undertook a labor to benefit Defendant in the form of provided "all hazards" firefighting services.

257.    All putative class members have actually performed such services, and Defendant has fully obtained the benefit of such services.

258. As their employer, Defendant was fully aware, and had actual notice of the fact that the putative class was performing said services.

259. As their employer, and in accordance with District of Columbia law, Defendant was aware that fully and properly funding the retirement benefits of the putative class was part and parcel of providing them full "wages," as that term is defined in applicable law.

260. Defendant was also fully aware that the putative class members were transferring from the EMS side to firefighting _for the express purpose of_ obtaining the more generous defined benefit pension plan benefits that were being denied to EMS employees that were part of Local 3721.

261. By refusing to fully fund the retirement benefits of the putative class, Defendant unlawfully withheld earned "wages."

262. There was no justification or excuse for Defendant's refusal to fully fund the retirement benefits of the putative class, therefore Class Plaintiffs assert that such was wrongful.

263. In November of 2021, Defendant announced that it was repudiating its obligation to fully compensate the putative class for services rendered.

264. This _quantum meruit_ claim is brought well within the three year statute of limitations for such claims.

265. As a direct and proximate result of Defendant's actions, putative class members have been substantially harmed by loss of the valuable benefit of a full retirement timely earned.

266. Herein, they seek compensatory and make whole damages including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.

**COUNT V**
*(Conversion)*

267.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

268.    Class Plaintiffs assert that Defendant made an offer of employment to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by written and verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO.

269.    In accordance with applicable District of Columbia law, and the collective bargaining agreements of Local 36 and Local 3721, the amount of money that each putative class member was entitled to have placed in the defined benefit fund for him or her was specifically ascertainable.

270.    In accordance with the plan documents of both the defined benefit and defined contribution plans, the amount of interest and the value of pension benefit for each putative class member was specific and ascertainable.

271.    Putative class members assert that the money in the defined contribution plan that they amassed as EMS employees, was their property, and that Defendant was not at liberty to use such funds for other reasons.

272.    Class Plaintiffs assert that appropriations from the City Council for the purpose of funding EMS transferee retirement benefits were functionally "wages" that they earned, and that Defendant was not at liberty to spend said funds on other things.

273.    In the years after putative class members transferred to firefighting, Defendant misappropriated, diverted, squandered, wrongfully retained, stole or embezzled the funds that were supposed to be used to provide retirement benefits to putative class member.

274.    In November of 2021, Defendant, by way of its agent Chief Donnelly, informed the putative class that Defendant had converted their retirement funds, resulting in the loss of earned benefits.

275.    As a direct and proximate result of Defendant's actions, putative class members have been substantially harmed by loss of the valuable benefit of a full retirement timely earned.

276.    Herein, they seek compensatory and make whole damages, including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.

## COUNT VI
*(Negligence)*

277.    Class Plaintiffs reference and incorporate all assertions in the previous paragraphs as if fully restated herein.

278.    Class Plaintiffs assert that Defendant made an offer of employment to each putative class member, by way of D.C. Code §5-409.01 *et seq.,* by written and verbal promises from DCFEMS managers and leaders, and by way of the 2015 SO.

279.    While each putative class member was fully and completely fulfilling his or her obligations to DCFEMS by transitioning to being "all hazards" trained firefighters, by going through fire suppression training, and making themselves available to respond to fires and other emergencies in the District of Columbia, Defendant was mismanaging its budget and funds in such a manner as to allow funds for retirement benefits for the putative class to disappear.

280.    Class Plaintiffs assert that as a result of the employment relationship, Defendant had a duty to the putative class to ensure that its agents were reasonably effective and efficient stewards over the funds reserved or appropriated for their retirement benefits.

281.    Defendant was negligent in its duty to ensure that its agents were properly managing the relevant retirement funds to ensure that the putative class members could retire on time.

282.    Defendant was negligent in its duty to ensure that its agents complied with the terms of D.C. Code §5-409.01 *et seq.*

283.    As a result of Defendant's negligence, the putative class members have lost hundreds of thousands of dollars in retirement benefits, and are now faced with the choice of retiring with nothing, paying for their retirement out of their own funds, or working for dozens of more years than they otherwise would have.

284.    The harm to the putative class as a result of Defendant's negligence is material and ascertainable via discovery.

285.    Herein, the putative class seeks compensatory and make whole damages, including costs, interest and attorney's fees, that will be ascertained through appropriate discovery, but that Class Plaintiffs believe are not less than $100,000,000.00.

## **CLASS CERTIFICATION**

## **RULE 23(a) FACTORS**

### NUMEROSITY

286.    At the time of this filing, the exact number of the members of the class is not known.  Class Plaintiffs seek appropriate pre-certification discovery to ascertain the exact number.  On information and belief, Plaintiffs believe the putative class to be more than 100 people.

287.    That number well exceeds the numerosity standard, and the interest of judicial efficiency will clearly be served by class treatment of the claims herein.

288.    Joinder of the cases is impractical, inefficient, and likely to deny justice to the class, inasmuch as most individual class members cannot afford to hire their own counsel, and the high likelihood of retaliation from DCFEMS will likely dissuade those who can from challenging Chief Donnelly's decision.

COMMONALITY

289.    Class Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

290.    The questions of fact common to the class are outlined in the factual section above.

291.    The questions of law common to the class include, but are not limited to, the following:

a.    Whether Defendant made material representations to class members that they would be funded in the defined benefit plan when they transferred to firefighting?

b.    If so, what specifically was promised to class members?

c.    Did Defendant's representations to the class constitute an "offer" to enter into a contract?

d.    Were the terms of the "offer" specific and determinable.

e.    Did the class members "accept" the offer by transferring to firefighting?

f.    Did the relinquishment of their participation in the defined contribution plan constitute a form of consideration?

g.    Did their attendance at the fire academy constitute a form of consideration?

h.    Did allowing themselves to be called to suppress fires, and bear the risks of firefighting constitute a form of consideration?

i.    Did Defendant unilaterally change the terms of the contract or breach its terms?

j.    What was the intention and effect of legislation passed by the City Council to govern transfers of EMS employees to firefighting?

k.    What is the legal effect of the terms in D.C. Code §5-409.01 *et seq.?*

l.    Does the putative class have a private right of action to enforce §5-409.01 *et seq.?*

m.    Did DCFEMS managers and leaders make verbal promises and representations to the class members about the effects of transferring to firefighting on their benefits?

n.      If so, was reliance on those representations reasonable?

o.      Did Defendant act wrongfully in its failure to fully fund retirement benefits for the putative class?

p.      Did Defendant convert funds earned by and/or earmarked for the putative class members?

q.      Did Defendant owe a duty to the putative class as a result of the employment relationship?

r.      What was that duty?

s.      Did Defendant violate its duty to the putative class?

t.      If so, what is the appropriate remedy?

## TYPICALITY

292.    Class Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

293.    All putative class members have the same claims, that Defendant violated §5-409.01 *et seq.,* that breached its contractual and equitable obligations to them, that Defendant converted funds they earned through their service, and that Defendant was negligent in its management of retirement funds.

294.    The Class Plaintiffs' claims are typical of the claims of the other putative members of the class.

295.    All putative class members were subject to the decisions of the Fire Chiefs.

296.    All putative class members were subject to the decisions of the City Council in appropriating funds for their retirements.

297.    All putative class members, regardless of tenure, were entitled to transfer of funds from the defined contribution plan into the defined benefit plan.

298.    All putative class members were told by Chief Donnelly that Defendant was not going to honor its obligations to fund their retirements.

## ADEQUACY OF REPRESENTATION

299.    Class Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

300.    Class Plaintiffs all have 20+ years of service to the DCFEMS, and represent the variety of types of conversion or transfer from EMS to firefighting.

301.    Class Plaintiffs are currently employed, fully participant and in contact with other putative class members, and able to speak adequately for them.

302.    Class Plaintiffs are prepared to fund and pursue the instant litigation to its end.

303.    Class Counsel, Pamela Keith, has been a labor and employment attorney for twenty-three (23) years.  She worked at some of the most prestigious labor and employment firms in Washington, DC: Jones Day, Morgan Lewis & Bockius and Ogletree Deakins, and Temple Law Offices, prior to starting the Center for Employment Justice.  Attorney Keith worked extensively on one of the largest class actions in American history (*Dukes, et al. v. Walmart*) while employed with Jones Day, and spent years working extensively on Rule 23 litigation.

304.    Class counsel is lead counsel in *Brinkley v. District of Columbia*, 1:21-CV-01537 (RBW), pending before this Court.

305.    Class counsel is prepared to partner with other reputable counsel as needed to manage the volume of this case.

## RULE 23(b)(2) FACTORS

306.    Class Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

307.    Certification of the class under Rule 23(b) is appropriate because declaratory and injunctive relief will provide a remedy to all putative class members with respect to their retirement benefits.

308.    The ultimate decision maker in this case is the Fire Chief, and his decision affected all putative class members equally.

309.    The individual claims in this case do not predominate over the class claims.

310.    Thus, declaratory, injunctive and affirmative relief to the entire class flows directly and automatically from proof of the facts herein, and the establishment that such facts constitute violations of the law.

311.    The entitlement to declaratory, injunctive and affirmative relief to the entire class necessarily predominates the litigation, and provides a one-time remedy to all putative class members negatively affected by the unlawful policies and practices described herein.

312.    Furthermore, the entitlement to declaratory, injunctive and affirmative relief forms the factual and legal predicate for appropriate monetary damages as well as non-monetary remedies for individual losses caused by the Defendant's actions.

313.    Thus, certification of the class to test and answer the questions of law and fact common to the class is appropriate, inasmuch as final legal resolution of those questions will provide remedy and closure for both the putative class and Defendant.

## RULE 23(b)(3) FACTORS

314.    Class Plaintiffs reassert all the factual allegations in the paragraphs above as if fully restated herein.

315.    All putative class members are affected by Defendants actions and decisions in the same way.

316.    There is no real or meaningful way for the putative class to otherwise obtain relief but through the class action process.

317.    Many, if not most, putative class members cannot afford individual counsel.

318.    Class Plaintiffs sought counsel to pursue their claims for several months, and few if any attorneys other than the undersigned, were willing to engage in extensive litigation against the city.

319.    If, in this litigation, Plaintiffs are able to prove the allegations herein, then the declaratory, injunctive and affirmative relief that flows therefrom will not simply remedy the injustice to them, it will modify policy, procedures, practices, customs, and modes of accountability.  This will  ensure that future EMS transferees will not be subjected to the same unlawful practices.

320.    This is precisely what the class action vehicle was designed to achieve, and why it is superior to any other available means for the adjudication of the claims of the putative class members.

321.    Discovery related to the key decision-makers at DCFEMS, and their policies and practices, is best done once, on a class wide basis, rather than dozens or hundreds of times, for each litigant. Such would be incredibly expensive, as well as time consuming and distracting for the key decision-makers.

322.    Allowing this matter to proceed as a class action will achieve economies of scale and cost, minimize the use of court recourses and time, ensure a consistent result applicable to all members of the class, and ensure that declaratory and injunctive relief provides a resolution that can move forward and prevent future claims.

323.    Class Plaintiffs intend to communicate with the putative class members via electronic and regular mailings to last known street address and email address, and any other method ordered by the court. Defendant is in possession of all information necessary to inform the putative class members of this action, and to inform them of their options as determined by this Court.

**RULE 23(b)(5) FACTORS**

324.    Class Plaintiffs represent bargaining unit and non-bargaining unit members affected by Defendant's actions.

325.    As deemed appropriate by this Court after conducting pre-certification discovery, Plaintiffs will seek the establishment of sub-classes to dispose of individual claims more efficiently.

**GROUP CLAIM**

**COUNT VII**

*(Violation of 42 U.S.C. Section 1981, enforced via Section 1983*
*Based on a Violation of the Fifth Amendment to the Constitution as*
*Applied to the District of Columbia – Disparate Treatment)*

326.    Plaintiffs incorporate and reference all allegations in the previous paragraphs as if fully restated herein.

327.    Plaintiffs are African American, and as such are members of a protected class.

328.    As employees of the District of Columbia, Plaintiffs have a contractual relationship with Defendant.

329.    Plaintiffs allege that Defendant holds and maintains a historic and longstanding custom, and pattern and practice of systemic race discrimination against African Americans.

330.    Plaintiffs were subjected to disparate terms and conditions of employment than their white counterparts, because of his race, African American.

331.    Plaintiffs were denied the benefit of their work when Defendant decided not to fully fund their retirement benefits.

332.    The decision not to fully fund Plaintiffs' retirement benefits was made by the Fire Chiefs, who are ultimate decision makers.

47

333.    While non-African Americans were also affected by the decisions of the Fire Chiefs, the substantial majority of those affected were African American.

334.    Plaintiffs assert that the decision to cannibalize retirement funds and to use them for other purposes was made because the retirement funds were earmarked for and earned predominantly by African Americans.

335.    Defendant specifically did not make any decision to upset or reduce retirement benefits for the predominantly white firefighters who were not EMS transferees.

336.    Plaintiffs assert that Defendant made the decision to ignore and abrogate its obligations under §5-409.01 *et seq.,* because it knew that the majority of people affected by it were African American, and it does not care about harm to African Americans.

337.    Defendant's actions were intentional, knowing and targeted at the cadre of employees that it does not value because they are predominantly minorities.

338.    Plaintiffs seeks to enforce their rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

339.    As a direct and proximate cause of Defendant's actions, Plaintiffs have lost hundreds of thousands of dollars in retirement benefits.

340.    As a direct and proximate cause of Defendant's actions, Plaintiffs have suffered severe mental and emotional anguish.

341.    Plaintiffs ask this Court to award them compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $1,750,000.00 each.

342.    Plaintiffs also ask this Court for declaratory and injunctive relief mandating that Defendant cease and desist from discriminating against minorities, especially African Americans, and that it fully abide by D.C. §5-409.01 *et seq.,* going forward.

## **INDIVIDUAL CLAIMS**

CLAIMS OF PLAINTIFF TIMMONS

### **COUNT VIII**

*(Violation of 42 U.S.C. Section 1981, enforced via Section 1983*
*Based on a Violation of the Fifth Amendment to the Constitution as*
*Applied to the District of Columbia – Disparate Treatment)*

343.    Plaintiff Timmons incorporates and references all allegations in the previous paragraphs as if fully restated herein.

344.    Plaintiff Timmons is African American, and as such is a member of a protected class.

345.    As an employee of the District of Columbia, Plaintiff Timmons has a contractual relationship with Defendant.

346.    Plaintiff Timmons alleges that Defendant holds and maintains a historic and longstanding custom, and pattern and practice of systemic race discrimination against African Americans.

347.    Plaintiff Timmons is an EMS Captain in the fire service, having abided by and met all of Defendants requirements to hold the title and position.

348.    Plaintiff Timmons has been denied the right and responsibility to sit on disciplinary trial boards for subordinate firefighters.

349.    This constitutes disparate treatment than his fellow Captains.

350.    Plaintiff Timmons was told that he could not sit on disciplinary trial boards for firefighters because he lacked experience as a firefighter manager.

351.    Defendant maintains a policy that people who transferred from the EMS service into firefighting cannot sit on trial boards.

352.    The majority of Fire Captains to whom this exclusion applies are African American.

353.   Defendant does not maintain the same policy in excluding firefighters who transfer to be Captains in the EMS service from sitting on trial boards of EMS employees.

354.   Trial boards are for disciplinary matters, such as misconduct, and are not reviews of technical performance, such that firefighting experience would be relevant to assessment.

355.   Plaintiff Timmons asserts that he possesses sufficient knowledge and experience to ascertain if an employee's actions warrant termination, as do the other EMS transferee Captains.

356.   Plaintiff Timmons asserts that Defendant's proffered reason for denying him the same rights and responsibilities as the predominantly white Captains who were not transferees is pretext for discrimination.

357.   Plaintiff Timmons asserts that Defendant's policy and practice is resulting in disparate and harsher discipline of African American firefighters, because African American Captains are excluded from having a say in disciplinary decisions.

358.   Plaintiff Timmons spoke directly with Chief Donnelly, an ultimate decision maker, about this disparate treatment of African American Fire Captains, and the impact it was having on disparate discipline.

359.   Chief Donnelly refused to change the policy.

360.   Defendant's actions were intentional, knowing and targeted at a cadre of African American employees that it does not value because they are Black.

361.   Plaintiff seeks to enforce his rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

362.   Plaintiff seeks declaratory relief from this Court in the form of an ORDER mandating that Defendant immediately cease and desist from this racially discriminatory and unjustified practice.

CLAIMS OF PLAINTIFF M. TURNER

**COUNT IX**

*(Violation of 42 U.S.C. Section 1981, enforced via Section 1983*
*Based on a Violation of the Fifth Amendment to the Constitution as*
*Applied to the District of Columbia – Disparate Treatment)*

363.    Plaintiff M. Turner incorporates and references all allegations in the previous paragraphs as if fully restated herein.

364.    Plaintiff M. Turner is African American, and as such is a member of a protected class.

365.    As an employee of the District of Columbia, Plaintiff M. Turner has a contractual relationship with Defendant.

366.    Plaintiff M. Turner alleges that Defendant holds and maintains a historic and longstanding custom, and pattern and practice of systemic race discrimination against African Americans.

367.    Plaintiff M. Turner is a firefighter/paramedic who transferred from the EMS service in 2017.

368.    As part of that transfer, Plaintiff M. Turner was promised to retain her seniority rights, which impact her promotional opportunities.

369.    Specifically, seniority points are added to the score of a person who takes a promotional exam, and can move them up the registrar list to get a higher priority for actual promotion.

370.    According to applicable regulation, to be eligible for promotion, a person has to have five years of continuous or intermittent service to the "fire department."

371.    At the time she took the promotional exam to Sergeant, Plaintiff M. Turner had 19 years of service to the fire department.

372.    In order to deny Plaintiff M. Turner a promotion she has earned and is entitled to, Defendant manufactured a requirement that in order to be promoted, Plaintiff M. Turner had to have five years of service in actual firefighting, as if firefighting is more valuable than paramedic services.

373.    Plaintiff M. Turner asserts that the residents of the District of Columbia rely on paramedics far more frequently than they rely on firefighters, so the distinction made by Defendant is without basis or business justification.

374.    Plaintiff M. Turner asserts that Defendant's actions disparately affect women and minorities, since the majority of transferees from EMS are minorities or women.

375.    Plaintiff M. Turner asserts that Defendant adopted this policy to ensure that the cadre of firefighters who were directly hired into firefighting, who are and have historically been predominantly white, in a stronger promotional position than those who transfer in from EMS, who are predominantly African American.

376.    Plaintiff M. Turner asserts that Defendant's proffered reason for denying her the promotion she is entitled to is pretext for discrimination.

377.    Plaintiff M. Turner spoke directly with Chief Donnelly, an ultimate decision maker, about this disparate treatment of African American EMS transferees.

378.    Chief Donnelly refused to change the policy.

379.    Defendant's actions were intentional, knowing and targeted at a cadre of African American employees that it does not value because they are Black.

380.    Plaintiff M. Turner seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

381.    As a direct and proximate cause of Defendant's intentional discriminatory treatment of Plaintiff M. Turner, she has and continues to suffer financial losses.

382.    As a direct and proximate cause of Defendant's intentional discriminatory practice against African Americans, Plaintiff M. Turner suffered severe emotional and mental stress and anguish.

383.   Plaintiff M. Turner now seeks compensatory damages, costs, interest, fees, and attorney's fees of not less than $500,000.00.

**COUNTS X & XI**
*(Violation of 42 U.S.C. § 2000(e), et seq., and the District of Columbia*
*Human Rights Act, D.C. Code § 2-1401, et seq.*
*--Disparate Treatment Based on Race)*

384.   Plaintiff M. Turner incorporates and references all allegations in the previous paragraphs as if fully restated herein.

385.   Plaintiff M. Turner is African American, and as such is a member of a protected class.

386.   As an employee of the District of Columbia, Plaintiff M. Turner has a contractual relationship with Defendant.

387.   Plaintiff M. Turner alleges that Defendant holds and maintains a historic and longstanding custom, and pattern and practice of systemic race discrimination against African Americans.

388.   Plaintiff M. Turner is a firefighter/paramedic who transferred from the EMS service in 2017.

389.   As part of that transfer, Plaintiff M. Turner was promised to retain her seniority rights, which impact her promotional opportunities.

390.   Specifically, seniority points are added to the score of a person who takes a promotional exam, and can move them up the registrar list to get a higher priority for actual promotion.

391.   According to applicable regulation, to be eligible for promotion, a person has to have five years of continuous or intermittent service to the "fire department."

392.   At the time she took the promotional exam to Sergeant, Plaintiff M. Turner had 19 years of service to the fire department.

393.   In order to deny Plaintiff M. Turner a promotion she has earned and is entitled to, Defendant manufactured a requirement that in order to be promoted, Plaintiff M. Turner had to have five years of service in actual firefighting, as if firefighting is more valuable that paramedic services.

394.    Plaintiff M. Turner asserts that the residents of the District of Columbia rely on paramedics far more frequently than they rely on firefighters, so the distinction made by Defendant is without basis or business justification.

395.    Plaintiff M. Turner asserts that Defendant's actions disparately affect women and minorities, since the majority of transferees from EMS are minorities or women.

396.    Plaintiff M. Turner asserts that Defendant adopted this policy to ensure that the cadre of firefighters who were directly hired into firefighting, who are and have historically been predominantly white, in a stronger promotional position than those who transfer in from EMS, who are predominantly African American.

397.    Plaintiff M. Turner asserts that Defendant's proffered reason for denying her the promotion she is entitled to is pretext for discrimination.

398.    Plaintiff M. Turner spoke directly with Chief Donnelly, an ultimate decision maker, about this disparate treatment of African American EMS transferees.

399.    Chief Donnelly refused to change the policy.

400.    Defendant's actions were intentional, knowing and targeted at a cadre of African American employees that it does not value because they are Black.

401.    As a direct and proximate cause of Defendant's intentional discriminatory treatment of Plaintiff M. Turner, she has and continues to suffer financial losses.

402.    As a direct and proximate cause of Defendant's intentional discriminatory practice against African Americans, Plaintiff M. Turner suffered severe emotional and mental stress and anguish.

403.    Plaintiff M. Turner now seeks compensatory damages, costs, interest, fees, and attorney's fees of not less than $300,000.00.

## COUNTS XII & XIII
*(Violation of 42 U.S.C. § 2000(e), et seq., and the District of Columbia*

*Human Rights Act,* D.C. Code § 2-1401, *et seq.*
*--Disparate Treatment Based on Gender)*

404.    Plaintiff M. Turner incorporates and references all allegations in the previous paragraphs as if fully restated herein.

405.    Plaintiff M. Turner is a woman, and as such is a member of a protected class.

406.    As an employee of the District of Columbia, Plaintiff M. Turner has a contractual relationship with Defendant.

407.    Plaintiff M. Turner alleges that Defendant holds and maintains a historic and longstanding custom, and pattern and practice of systemic gender discrimination.

408.    Plaintiff M. Turner is a firefighter/paramedic who transferred from the EMS service in 2017.

409.    As part of that transfer, Plaintiff M. Turner was promised to retain her seniority rights, which impact her promotional opportunities.

410.    Specifically, seniority points are added to the score of a person who takes a promotional exam, and can move them up the registrar list to get a higher priority for actual promotion.

411.    According to applicable regulation, to be eligible for promotion, a person has to have five years of continuous or intermittent service to the "fire department."

412.    At the time she took the promotional exam to Sergeant, Plaintiff M. Turner had 19 years of service to the fire department.

413.    In order to deny Plaintiff M. Turner a promotion she has earned and is entitled to, Defendant manufactured a requirement that in order to be promoted, Plaintiff M. Turner had five years of service in actual firefighting, as if firefighting is more valuable than paramedic services.

414.    Plaintiff M. Turner asserts that the residents of the District of Columbia rely on paramedics far more frequently than they rely on firefighters, so the distinction made by Defendant is without basis or business justification.

55

415.    Plaintiff M. Turner asserts that Defendant's actions disparately affect women and minorities, since the majority of transferees from EMS are minorities or women.

416.    Plaintiff M. Turner asserts that Defendant adopted this policy to ensure that the cadre of firefighters who were directly hired into firefighting, who are and have historically been predominantly male, in a stronger promotional position than those who transfer in from EMS, which is substantially more female.

417.    Plaintiff M. Turner asserts that Defendant's proffered reason for denying her the promotion she is entitled to is pretext for discrimination.

418.    Plaintiff M. Turner spoke directly with Chief Donnelly, an ultimate decision maker, about this disparate treatment of female EMS transferees.

419.    Chief Donnelly refused to change the policy.

420.    Defendant's actions were intentional, knowing and targeted at a cadre of female employees that it does not value because of their gender.

421.    As a direct and proximate cause of Defendant's intentional discriminatory treatment of Plaintiff M. Turner, she has and continues to suffer financial losses.

422.    As a direct and proximate cause of Defendant's intentional discriminatory practice against female firefighters, Plaintiff M. Turner suffered severe emotional and mental stress and anguish. Plaintiff M. Turner now seeks compensatory damages, costs, interest, fees, and attorney's fees of not less than $300,000.00.

## PRAYER FOR RELIEF

423.    On behalf of the putative class, Class Plaintiffs seek all monies due and owing to be transferred into the defined benefit plan to fully fund and vest them in their retirement benefits, in accordance with District of Columbia law.  This total amount will be ascertained after discovery, but Class Plaintiffs assert that the amount is not less than $100,000,000.00.

424.    On behalf of the putative class, Class Plaintiffs seek declaratory and injunctive relief forcing Defendant to permanently cease and desist from underfunding the pensions of EMS transferees.

425.    On behalf of themselves, Plaintiffs seek compensatory damages for the violation of their civil rights and Defendant's intentional race discrimination, of not less than $1,750,000.00 each.

426.    Plaintiff Timmons seeks declaratory and injunctive relief that causes Defendant to stop discriminating against EMS transferee Captains, and allows them to serve in every and all capacities as Captains who were not transferees.

427.    Plaintiff M. Turner seeks compensatory damages for her race and gender discrimination claims pursuant to Title VII of the Civil Rights Act of 1967 and the District of Columbia Human Rights Act of not less than $1,200,000.00.

428.    Plaintiff M. Turner seeks declaratory and injunctive relief by way of an ORDER mandating that Defendant immediately cease and desist from denying seniority points and credit to EMS transferees, and to treat them in every way as co-equal to fire department employees who are not transferees.

429.    Plaintiffs collectively seek all other damages including costs, fees, interest and attorneys' fees and all other remedies deemed appropriate by the jury and/or Court.


## JURY TRIAL DEMAND

430.    Plaintiffs demand trial by jury of all claims so triable.


                         Respectfully submitted,

                         /s/ Pamela M. Keith
                         Pamela M. Keith [Bar No. 448421]
                         CENTER FOR EMPLOYMENT JUSTICE
                         650 Massachusetts Ave. NW
                         Suite 600

Tel: (202) 800-0292
Fax: (202) 807-5275
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiffs*