## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| RICARDO CLARK, *on behalf of himself and all similarly situated individuals, et al.*, |
| *Plaintiffs*, |
| v. |
| DISTRICT OF COLUMBIA, *et al.*, |
| *Defendants*. |

Civil Action No. 23-1564 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, eight D.C. firefighters who previously served as paramedics and emergency medical technicians ("EMTs"), seek declaratory, injunctive, and monetary relief from the District of Columbia and the District of Columbia Retirement Board ("DCRB"), on behalf of themselves and other similarly situated individuals. Dkt. 26 at 2, 86–87 (SAC). District of Columbia firefighters have long received retirement benefits through the Police and Firefighter Retirement and Relief Fund ("FRRF"), *id.* at 6, which is a defined benefit plan, *id.* at 3. The DCRB is an independent agency that serves as fiduciary for the FRRF. *Id.* at 15 (SAC ¶ 10). Each participant in the defined benefit plan must contribute eight percent of his or her base pay to the FRRF, and the District contributes the balance. Dkt. 39-1 at 10. After twenty-five years of service, the FRRF provides retirees with an annuity at a rate of 2.5% of their average salary multiplied by their total number of years of service, with a maximum benefit of eighty percent of the retiree's average salary. Dkt. 26 at 21 (SAC ¶¶ 62–63).

Plaintiffs challenge the District's failure to include their prior service as EMTs in the calculation of their FRRF benefits. They claim that by failing to provide them with this credit,

the District violated two D.C. statutes, D.C. contract and tort law, and federal antidiscrimination law, 42 U.S.C. § 1981. They bring thirteen claims (Counts I–XIII) on behalf of all eight named plaintiffs and a putative class (asserting violations of D.C. Code § 5-409.01 *et seq.* and § 1-704, breach of unilateral contract, breach of implied contract, promissory estoppel, quantum meruit, fraud in the inducement, conversion, negligence, negligent supervision, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and misrepresentation), and they bring a "collective claim" of disparate treatment under Section 1981 (Count XIV) on behalf of all plaintiffs, except Mark Baker. *See* Dkt. 26 at 53–78 (SAC). Plaintiffs Michael Timmons and Melissa Turner also bring individual discrimination claims pursuant to Section 1981, Title VII, and the D.C. Human Rights Act (Counts XV–XX). *Id.* at 78–86.

 Five motions are now before the Court:

 *First*, all Plaintiffs except Melissa Turner move for an "Immediate Injunctive Relief." Dkt. 10. For present purposes, they ask that the Court defer ruling on their discrimination claims and their claims for class relief and, instead, focus on their statutory and common law claims relating to their eligibility for retirements benefits comparable to what they would have received had they worked as firefighters—rather than EMTs and then firefighters—over the entire course of their public service. *Id.* at 6. According to these Plaintiffs, they each now have more than twenty-five years of combined service as EMTs and firefighters and are eligible to retire. *Id.* at 5. They will not do so, however, without assurances that they will receive credit not only for purposes of their retirement date but also for purposes of calculating their retirement benefits based on their combined years of service. *See id.* at 16, 47. Without this assurance, Plaintiffs assert, they lack the financial security necessary to retire and will continue to work as

firefighters, despite the toll that the work has taken on them over the years and the risks that are inherent in the job. *See id.* at 10, 39–40.

Although these Plaintiffs invoke Federal Rule of Civil Procedure 65(a) in support of their motion, they seem to recognize that the relief that they seek—an order "immediately credit[ting] them with [the] years [that they] served in the EMS . . . so that they can retire immediately," *id.* at 45—would constitute permanent relief on their core statutory and common law claims. As they explain, they seek immediate assurances that they will receive the full retirement benefits at issue in this action if they retire now, and they ask the Court to order Defendants— immediately—to ensure that they are "fully vest[ed]" in the FRRF, "retroactive to when they began their service to the D.C. Fire and Emergency Services Department," and to "to ensure that [they] are permitted to retire with full tier 2 retirement benefits within thirty . . . days of the issuance of" the Court's order. *Id.* at 47–48. In short, although Plaintiffs' motion is brought under Rule 65(a) and although it recites the standard for granting preliminary relief, in substance, they seek summary judgment and the issuance of a permanent injunction. Defendants oppose that motion. Dkt. 40.[1]

*Second*, Defendants cross-move to dismiss and/or for partial summary judgment on the twenty claims asserted in Plaintiffs' Second Amended Complaint ("Complaint" or "SAC"). Dkt. 39. That motion raises an array of defenses, including lack of jurisdiction, failure to state a claim, statute of limitations, and failure to exhaust under D.C.'s Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.02 *et seq. See* Dkt. 39-1.

---

[1] Defendants filed their Opposition to Plaintiffs' Motion for Immediate Injunction as a separate docket entry, Dkt. 40, from their Cross-Motion to Dismiss or, in part, for Summary Judgment, Dkt. 39. The filings are, however, identical, and, for the sake of brevity, the Court will hereinafter refer only to Dkt. 39.

*Third*, invoking Federal Rule of Civil Procedure 56(d), Plaintiffs move for leave to take discovery before resolving Defendants' motion for summary judgment.  Dkt. 41.  As required by Rule 56(d), Plaintiffs have filed a declaration describing, at least in broad strokes, the discovery that they would like to take before addressing the merits of the case.  Dkt. 41-3.

*Fourth*, Plaintiffs move to strike, Dkt. 51, Defendants' Notice Regarding Plaintiffs' Reply in Support of Their Rule 56(d) Motion to Seek Discovery, Dkt. 50, arguing that this four sentence "Notice" constitutes an unauthorized sur-reply.

*Finally*, over Defendants' opposition, Dkt. 58, Plaintiffs move for an enlargement of time to move for class certification pursuant to Local Civil Rule 23.1(b), which, absent leave of the Court, requires a putative class representative to move for class certification within 90 days of the filing of the complaint, Dkt. 57.

For the reasons explained below, the Court will deny Plaintiffs' motion for an immediate injunction, Dkt. 10; will grant Defendants' motion to dismiss as to Counts I–XV, but will do so without prejudice, and will deny Defendants' motion to dismiss as to Counts XVI–XX, Dkt. 39; will deny Defendants' motion in the alternative for partial summary judgment, Dkt. 39, and Plaintiffs' motion for leave to take discovery, Dkt. 41, as moot in light of the Court's determination that Plaintiffs have yet to raise a federal cause of action sufficient to support their assertion of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and Article III; will deny Plaintiffs' motion to strike, Dkt. 51; and will grant Plaintiffs' motion for an enlargement of time to move for class certification, Dkt. 57.

## I. BACKGROUND

The District of Columbia currently has one department, known as D.C. Fire and Emergency Services, which "is an all-hazards agency that provides both fire suppression and

emergency medical services." Dkt. 39-1 at 10. It was not always this way. For many years, D.C. had a fire suppression service and an emergency medical service ("EMS"), which included EMTs and paramedics. Dkt. 26 at 3 (SAC). According to Plaintiffs, "prior to the 1980s," the fire suppression service was "predominately white and overwhelmingly male" while the emergency medical service "was predominantly Black[] and had substantially more women." *Id.* at 2–3. The two services had separate unions, separate budgets, different pay scales, and different retirement plans. *Id.* at 3–4. Originally, both services offered employees a defined benefit plan: fire suppression had the FRRF and "[p]rior to 1987, EMS employees were part of the federal Civil Service, which [offered] a defined benefit pension plan." *See id.* at 3. In 1987, however, new "EMS employees were moved to a city-wide municipally-controlled defined contribution plan similar to a 401(k), which is called a 401(a) plan." *Id.* Under the defined contribution plan, "the District contributes an amount equal to five percent of each participant's base salary into a trust[;] . . . [e]mployees become fully vested in the [plan] after five years of creditable service[,] . . . reach the age of 65 and separate from District employment, die while employed by the District, or become entitled to disability benefits under the Social Security Act;" and "[a] vested participant or former participant . . . will [start to] receive . . . benefits" upon "separation from District employment, disability, or death." Dkt. 39-3 at 1 (Defs' SUMF ¶¶ 2–5); *see also* Dkt. 42-3 at 2 (Pls' Opp. to Defs' SUMF ¶¶ 2–5).

This contrasts with the FRRF defined benefit plan, which requires each participant to pay eight percent of his or her base salary into the fund each year. Dkt. 39-3 at 2 (Defs' SUMF ¶ 7); Dkt. 42-3 at 2 (Pls' Opp. to Defs' SUMF ¶ 7). The District then contributes additional funds sufficient to provide FRRF participants with "an annuity calculated based on the participant's years of creditable service and average base pay." Dkt. 39-3 at 2 (Defs' SUMF ¶¶ 8–9); *see also*

Dkt. 42-3 at 2 (Pls' Opp. to Defs' SUMF ¶¶ 8–9) (denying these facts as applied to plaintiffs but accepting them in general).  After completing twenty-five years of service, a FRRF participant is entitled to a life-time annuity equal to 2.5% of the participant's average salary multiplied by his or her total years of service but capped at eighty percent of average pay.  *See* D.C. Code § 5-712(a), (c); *see also* Dkt. 26 at 21 (SAC).[2]

In 2001, the D.C. Council enacted the Paramedic and Emergency Medical Technician Lateral Transfer to Firefighting Amendment Act ("Transfer Amendment Act"), which authorized the Mayor "to provide for the transfer of . . . paramedics [and] emergency medical technicians to be uniformed firefighters."  D.C. Law 14-28 at § 202(a) (codified at D.C. Code § 5-409.01(a)).  The Council further required that the District assign transferred EMTs to the "step and class with a rate of pay closest to, but not lower than, the rate of pay earned by the employee prior to the transfer."  *Id.*  The Transfer Amendment Act also amended the Policemen and Firemen's Retirement and Disability Act, 39 Stat. 718 (codified at D.C. Code § 5-704), by adding the following section:

> (9)(A) Any member who is an officer or member of the District of Columbia Fire and Emergency Medical Services Department who was transferred pursuant to the Paramedic and Emergency Medical Technician Lateral Transfer to Firefighting Amendment Act of 2001, and who elects to, shall be covered by the Police Officers, Fire Fighters, and Teachers Retirement Benefit Replacement Plan Act of 1998, effective September 18, 1998 (D.C. Law 12-152; D.C. Official

---

[2]  The governing statute further provides as follows:

> Any member of the Metropolitan Police force or of the Fire Department of the District of Columbia having reached the age of 60 years shall, in the discretion of the Mayor, and any member of the United States Secret Service Uniformed Division or of the United States Park Police force or of the United States Secret Service Division to whom this subchapter apply shall, in the discretion of the head of his department, be retired from the service and shall be entitled to receive an annuity as computed under subsection (a) of this section.

D.C. Code § 5-712(b).

Code § 1-901.01 *et seq.*), and shall receive credit for prior years of service within the District of Columbia Fire and Emergency Medical Services Department as provided in subparagraphs (B), (C), and (D) of this paragraph.

(B) *Solely for the purposes of determining vesting and retirement eligibility*, members shall receive credit for prior service with the District of Columbia Fire and Emergency Medical Services Department.

(C) Members shall be *eligible to purchase benefit accrual service* for some or all of the time they were employed by the District of Columbia Fire and Emergency Medical Services Department. *The member shall deposit to the credit of the District of Columbia Police Officers and Fire Fighters' Retirement Fund an amount that is equal to the dollar increase in the present value of future benefits which results from crediting the prior service.* The present value of future benefits shall be calculated on the actuarial assumptions and methods used to calculate the present value of future benefits from section 133(a)(3)(B) of the Police Officers, Fire Fighters, and Teachers Retirement Benefit Replacement Plan Act of 1998, effective September 18, 1998 (D.C. Law 12-152; D.C. Official Code § 1-907.03(a)(3)(B)), for the applicable fiscal year . . . .

(D) For the purposes of this section, the term 'prior service' means any prior service in the District of Columbia Fire and Emergency Medical Services Department, regardless of whether there is a break in service.

*Id.* § 203 (emphasis added). In short, EMTs who transferred to the fire service and elected to be covered by the FRRF defined benefit plan (1) were entitled to receive credit for their prior service as EMTs with the EMS for the purpose of "determining vesting and retirement eligibility" and (2) were entitled to "purchase benefit accrual"—in essence, catch-up payments—for the time they worked for the District as EMTs with the EMS.

The Summary Plan Description promulgated in 2007 for the D.C. Police Officers' and Firefighters' Retirement Plan reflected this arrangement. It explained:

If you transferred after October 2, 2001 from being an EMT with the EMS to become a uniformed EMT firefighter with the Fire Department pursuant to the Lateral EMT Act, you may *elect* to become a Plan member. If you make this election, you may be eligible to receive credit for your prior EMS service. You do not need to complete a purchase of service deposit for your prior EMS service to be used to determine your *eligibility* for a retirement benefit and whether you are *vested* in the Plan. You must complete a purchase of service deposit of your prior EMS service for it to be included in your total creditable service to calculate the *amount* of your retirement benefit.

Dkt. 39-15 at 5 (emphasis in original); *accord* Dkt. 39-16 at 25 (2012 Summary Plan).

Then, in 2008, the D.C. Council enacted the Paramedic and Emergency Medical Technician Transition Amendment Act of 2008 ("2008 Act").  D.C. Law 17-356, 56 D.C. Reg. 1614 (2009).  The 2008 Act authorized the Mayor to create a new All Hazards/EMS Specialist role and provided that employees who transfer into the new role as All Hazards/EMS Specialists "may elect to participate in the" defined benefit plan.  *Id.* § 2.  For employees who make the election and who previously participated in the District's defined contribution plan, the 2008 Act provided that "all of the employee's interest in contributions and earnings under the defined contribution plan shall be transferred from the defined contribution plan to the" FRRF "in accordance with section 12(c)(9)(B)(ii) or (iii) of the Policemen and Firemen's Retirement and Disability Act."  *Id.*  The 2008 Act also amended the provision added by the Transfer Amendment Act in 2001, § 5-704(9), which is quoted at length above (including § 12(c)(9)(B)). As relevant here, the D.C. Council maintained the language from the Transfer Amendment Act permitting transferees to elect to participate in the FRRF and to "receive credit for prior years of service," but then added new language in § 12(c)(9)(B)—applicable both to those transferring to a position as a firefighter and those "transitioning to an All Hazards/Emergency Medical Services Specialist" position—explaining what it would mean to "receive credit for prior service."  D.C. Law 17-356, § 3.

In sub-subparagraph (B)(i), the Council provided that members of the EMS who transferred pursuant to the Transfer Amendment Act or the 2008 Act, and who previously participated in the defined contribution plan, would be covered by the FRRF "commencing on the date of transition" and would "receive credit for prior years of service . . . for the purpose of determining vesting and retirement eligibility under the" FRRF "but not for the purpose of

calculating the amount of benefits to be received under the" FRRF, "except as provided in sub-subparagraphs (ii) and (iii)." *Id.* Sub-subparagraph (B)(ii), in turn, provided that unless the transferee elects otherwise, as discussed below, his or her "entire interest in contributions and earnings under the defined contribution plan" would be transferred to the FRRF, and the transferee would receive "an amount of benefits under the [FRRF] that is equal to the actuarial equivalent of the dollar amount of contributions and earnings transferred." *Id.* Finally, sub-subparagraph (B)(iii) provided that a transferee could elect, in lieu of receiving a partial credit based on the transfer of funds from the defined contribution plan, "to purchase benefit accrual service for *all of the time* they were employed by" EMS. *Id.* (emphasis added). That "deposit" would include "the member's entire interest in contributions and earnings under the defined contribution plan" and any "excess amount" due would be funded either from "another retirement plan" or, if permissible, from "after-tax monies by the member that may be made in equal monthly installments prior to retirement." *Id.*

The most relevant section of the 2008 Act, however, does not come until near the end. That section provides that the "act shall apply upon the inclusion of its fiscal effect in an approved budget and financial plan." *Id.* § 4. And, according to Defendants, "[t]he Paramedic and Emergency Medical Technician Transition Amendment Act of 2008 was not included in a balanced budget." Dkt. 39-3 at 3 (Defs' SUMF ¶ 18). Although Plaintiffs dispute that premise, *see* Dkt. 42-3 at 3 (Pls' Opp. to Defs' SUMF ¶ 18), Defendants proffer a memorandum prepared in February 2009 by the District's Chief Financial Officer, Dkt. 39-6 at 2, asserting that "[f]unds are not sufficient in the FY 2009 through FY 2012 budget and financial plan to implement the provisions of the enrolled legislation," *id.* at 3.

In any event, the 2008 Act was repealed in 2017, D.C. Act 22-33, Sec. 7046 (July 31, 2017), reverting to the law as enacted in the Transfer Amendment Act.  Thus, under current law, "[a]ny member" of the EMS "who was transferred pursuant to" the 2001 law is entitled to "receive credit for prior years of service within" the EMS, but "[s]olely for the purposes of determining vesting and retirement eligibility."  D.C. Code. § 5-704(i)(1), (2).  Beyond that, transferees are "eligible to purchase benefit accrual service"—that is, to make what are essentially catch-up payments—"for some or all of the time they were employed by" EMS in "an amount that is equal to the dollar increase in the present value of future benefits which results from crediting the prior service."  *Id.* § 5-704(i)(3).  And, finally, a member that participated in the defined contribution plan "may transfer all or a portion of his or her defined contribution plan account balance into the" FRRF as a credit toward the "purchase of prior service."  *Id.*

At least at times, Plaintiffs seem to dispute this understanding of the legislative background.  But, more significantly, they maintain that—even if no statute or other law ever granted them the right to receive credit for prior services for purposes of calculating the amount of benefits to be received (as opposed merely to determining when their interests vest and when they may retire)—they were induced to transfer from their positions as EMTs to firefighters based on the promise that they would receive the same retirement benefits that they would have received had they served as firefighters from the beginning.  Plaintiffs allege, for example, that "[f]or years, the Fire Chiefs, and executives . . . assured Plaintiffs that [the District] was 'working on' fully funding their pension benefits" and that they "were told that they would get 'year for year credit' in the FRRF, and that [the District] was going to move money from the defined contribution plan to the FRRF."  Dkt. 26 at 10 (SAC).  It was not until November 2021, according to Plaintiffs, that they finally learned from Chief John Donnelly's announcement at a

town hall meeting that the District would not "make Plaintiffs whole." *Id.* Plaintiffs' allegations about what they believe they will receive in the absence of court relief are inconsistent: at times they allege that they will get "nothing" unless they work for "dozens of more years to earn a full benefit in the FRRF," *id.*, and "will simply be DC employees with no retirement benefits," *id.* at 31 (SAC ¶ 152), while at other times, they suggest that they will lose their 401(a) savings but receive the amount they earn in the FRRF during the period after their transfer, *id.* at 11.

Defendants, for their part, point to various pronouncements made between 2008 and 2021 that, on their telling, contradict Plaintiffs' account. In 2013, 2015, and 2016, for example, the fire department issued Special Orders announcing firefighter roles. The FAQ section of each of these orders contained the following:

> Upon appointment to a firefighter, you are eligible to be placed in the Police Officers, Fire Fighters and Teachers Retirement Benefit Replacement Plan of 1998 (Firefighters Plan), as set forth in D.C. Official Code § 1-901.01 *et seq*. (2001). . . .

> Contributions made to the Civil Service Retirement System and the D.C. Defined Contribution Pension Plan, 401(A) CANNOT BE "TRANSFERRED" to the Firefighter's Plan. However, employees may "buy" time in the Firefighter's Plan based on prior credible FEMS service.

Dkt. 39-9 at 6; *accord* Dkt. 39-10 at 6; Dkt. 39-11 at 6. The District also held various meetings with the firefighters over the years, including a May 2015 meeting with the firefighters who transitioned from EMS in 2009. Dkt. 39-12. According to Defendants, slides were presented at that meeting that explained (1) that "EMS service is counted only for retirement <u>eligibility</u> purposes;" (2) that the "future annuity received from [the FRRF will be] based on service from the 2009 transition up until the date of retirement;" and (3) that "[t]ransitioned members must purchase additional previous service to receive a higher annuity." *Id.* at 7. This presentation further explained that if the transferee-firefighters did not purchase additional years of prior service, they would "receive an annuity based on years of active service from date of transfer

into the Police/Fire Plan and will also retain their 401(a) benefits." *Id.* at 9.  The purchase of additional "prior service" would require payment of "the full actuarial value of the service which includes missed District contributions, employee contributions, and fund interest." *Id.* at 10.

## II. ANALYSIS

The Court will consider each of the five pending motions in turn, starting with Plaintiffs' Motion for Immediate Injunction, Dkt. 10.

### A.      Plaintiffs' Motion for an "Immediate Injunction"

As Plaintiffs seem to recognize, their Motion for Immediate Injunction is not easy to categorize.  Although the motion is not captioned as a motion for a preliminary injunction, Plaintiffs ask the Court to apply the Rule 65 standard for granting preliminary relief, *id.* at 12, and they devote most of their brief to addressing their likelihood of success on the merits, *id.* at 22–38.  But the relief that they seek is anything but preliminary.  The movants represent that they have worked for more than twenty-five years, first as EMTs and later as firefighters; that they want to retire immediately; but that they cannot do so without assurances that they will receive the full benefits that they would have received had they spent their entire careers working as firefighters.  *Id.* at 1–2, 5–12, 38–48.  They further assert that they "are ready to retire;" that they are worn down by their years of service; and that they are "trapped" in their jobs because they do not have the financial means to retire now.  *Id.* at 41–43.  And they ask the Court to direct that the District "immediately credit them with years served in the EMS service," "cease and desist from preventing them from liquidating the assets stuck in their dormant defined contribution plans," *id.* at 45, and "expediently and with all haste take all steps necessary to ensure that [they] are permitted to retire with full tier 2 retirement benefits within thirty . . . days of the issuance of" the Court's order, *id.* at 48.

Although the standards applicable to preliminary and permanent injunctions overlap in certain respects, they are not the same.  A preliminary injunction "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the movant "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The balance of harms and the public interest factors merge when the government is the opposing party."  *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The D.C. Circuit has hinted that *Winter* "should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93), but it "has not yet needed to decide th[e] issue," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

Regardless, it is clear that "[t]he likelihood of success and irreparability of harm 'are the most critical' factors."  *Thompson*, 20 F.4th at 31 (quoting *Nken*, 556 U.S. at 434).  "Because 'the basis of injunctive relief has always been irreparable harm,' a plaintiff must, at minimum,

'demonstrate that irreparable injury is *likely* in the absence of an injunction[.]'" *Arriva Medical v. U.S. Dep't of Health & Hum. Serv.*, 239 F. Supp. 3d 266, 277 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); then *Winter*, 555 U.S. at 21).  A showing that irreparable injury is "likely" is the *sine qua non* for obtaining a preliminary injunction—that is, it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases.  Thus, if a party seeking a preliminary injunction fails to make the required showing of irreparable injury, the matter is settled, and the Court must deny the motion.

Finally, to the extent Plaintiffs do not merely seek to maintain the status quo but, rather, seek a mandatory injunction, they face a particularly steep hill.  *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).  Mandatory injunctions "are disfavored as 'an even more extraordinary remedy' than the typical preliminary injunction," *Strait Shipbrokers Pte. Ltd*. *v. Blinken*, 560 F. Supp. 3d 81, 92 (D.D.C. 2021) (quoting *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013)), and courts "exercise extreme caution in assessing" such motions, *id*. (quoting *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 57 (D.D.C. 2012)).

To obtain a permanent injunction, in comparison, the Plaintiff must first demonstrate that it is entitled to prevail on the merits—a mere likelihood of success is not enough—and must also "demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay, Inc. v.*

*MercExchange*, LLC, 547 U.S. 388, 391 (2006); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).  "When the defendant is the government, factors (3) and (4) merge."  *Anatol Zuckerman and Charles Krause Reporting, LLC v. U.S. Postal Service*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *Nken*, 556 U.S at 435).  "Failing to satisfy any factor is grounds for denying relief."  *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 694 (D.C. Cir. 2015) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982)).

Moreover, where, as here, movants seek a permanent injunction before trial, they must satisfy the demanding summary judgment standard—that is, it must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if" it may "affect the outcome" of the litigation*. Holcomb v, Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

Ultimately, however, little turns on whether Plaintiffs' motion is characterized as a motion for a preliminary injunction or a motion for a permanent injunction, because their motion fails under either standard.

1.    *Plaintiffs Have Failed to Show They Have Suffered or Are Likely to Suffer Irreparable Injury.*

Because irreparable injury is the *sine qua non* for issuance of a preliminary injunction, and because it is what justifies the Court's exercise of its equitable power at any point in the litigation, the Court begins with that requirement.  The D.C. Circuit "has set a high standard for

irreparable injury.  First, the injury 'must be both certain and great; it must be actual and not theoretical.' . . .  Second, the injury must be beyond remediation." *Chaplaincy*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  To prove that an injury is "irreparable," allegations of "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.* (quoting *Wisc. Gas Co.*, 758 F.2d at 674).  Where a plaintiff seeks preliminary relief, "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* (quoting *Wisc. Gas Co.*, 758 F.2d at 674).  "Where the harm is financial, moreover, 'an insufficiency of savings or difficulties in immediately obtaining [replacement income] . . . will not support a finding of irreparable injury, however severely [it] may affect a particular individual.'" *Arriva Medical*, 239 F. Supp. 3d at 281 (quoting *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)).

Here, Plaintiffs acknowledge that "courts typically find that mere financial loss does not, in and of itself, constitute irreparable harm," Dkt. 10 at 38, but they argue that this case is different because, absent relief, they will be "forced to work dozens of years beyond the typical retirement age" in a profession that is both dangerous and physically and mental wearing, *id.* at 39–41.  Plaintiffs attempt to support this contention with the example of Mark Baker, who served as an EMT from 1989 to 2009, before transferring to "the fire service in early 2009." *Id.* at 39.  According to Plaintiffs, Baker "now has 34 years of service to the city," would like to retire, but is "financially trapped in the job for years to come" because he has only $148,288.21 in his defined contribution plan and will not "vest in the FRRF for another 11 years," leaving him with "absolutely nothing from that plan." *Id.*

For present purposes, the Court need not reach the question whether the denial of retirement benefits can ever constitute irreparable injury, because Plaintiffs' understanding of the rights that Baker and others currently have is mistaken.  As discussed above, under the Transfer Amendment Act, an EMT who transferred to the fire service is entitled to receive credit for his or her service as an EMT for purposes of "determining vesting and retirement eligibility," is entitled to purchase additional benefit accrual in the FRRF with principal and earnings held in the employees' defined contribution plan account, and is entitled to receive FRRF benefits equal to 2.5% of his or her average salary multiplied by his or her years in the fire service, plus any additional FRRF benefits purchased with define contribution plan funds.  As a result, Plaintiffs' assertion that Baker and other similarly situated Plaintiffs are "entitled to absolutely nothing from" the FRRF is wrong.  Dkt. 10 at 39.  In Baker's case, for example, because he has over twenty-five years of combined service, his interest in the FRRF has vested and he is eligible to retire.  And because he transferred to the fire service in "early 2009," Dkt. 10 at 39, he is currently entitled, upon retirement, to receive an FRRF annuity equal to 2.5% of his average salary multiplied by fourteen (or more), plus any additional benefits he might elect to purchase with the funds in his defined contribution plan account.  Although not a large sum, it is far from "nothing," and Plaintiffs have failed to explain why that amount leaves Baker, or any other Plaintiff, "financially trapped in the job for years to come."  Dkt. 10 at 39.

As a result, Plaintiffs' theory of irreparable injury fails on its own terms.  That is, even if Plaintiffs were correct that the loss of all or most retirement benefits might, in an extreme case, satisfy the irreparable injury requirement, this is not such a case.  Each Plaintiff who transferred from the EMS to the fire service and who has at least twenty-five years of combined service (1) is entitled to retire now; (2) is entitled either to draw upon or to transfer the funds in his or

her defined contribution plan account; and (3) has a vested interest in an amount equal to (at least) 2.5% of his or her average salary multiplied by the number of years he or she worked in the fire service.  The District acknowledges that each otherwise qualified Plaintiff is entitled to this amount, and, more importantly, that is what the Transfer Amendment Act says.  Plaintiffs, in turn, offer no evidence that any of the movants (the one Plaintiff who has not yet accrued twenty-five years of combined service is not seeking injunctive relief) would be "forced to work dozens of years beyond the typical retirement age," *id.* at 40, despite the availability of these benefits. Nor do they offer any evidence indicating that the District would "prevent[] them from liquidating the assets . . . in their . . . defined contribution accounts, including" earnings, *id.* at 45, should they elect to retire.

The Court, accordingly, concludes that Plaintiffs have failed to carry their burden of demonstrating that they are likely to suffer irreparable injury (under the preliminary injunction standard) or that the undisputed evidence shows that they will suffer irreparable injury (under the permanent injunction/summary judgment standard) absent issuance of an injunction.

2.     *Plaintiffs Have Failed to Show That They Are Likely to Succeed on the Merits or That They Are Entitled to Summary Judgment.*

At least at this early stage of the litigation, Plaintiffs fare no better on the merits of the "statutory, tort and contract claims" that they invoke in support of their Motion for Immediate Injunction, Dkt. 10 at 6.  For now, Plaintiffs press only those claims that seek individual relief (as opposed to class relief) relating to their right to receive FRRF benefits calculated based on their combined years of service—that is, FRRF benefits that do not merely vest after twenty-five years of combined service but that are also calculated based on their combined years of service—and they ask that the Court postpone addressing their Section 1981 "collective claim," their class claims, and their unrelated, individual discrimination claims.  *Id.*

As an initial matter, the Court notes that Plaintiffs do not even attempt to argue that they clear the summary judgment hurdle with respect to these claims.  That concession is well taken. For the reasons explained above, the Court sees little, if any, merit in Plaintiffs' claims based on the Transfer Amendment Act and the now-repealed 2008 Act.  To the contrary, neither law ever suggested that a transferee firefighter would be entitled to benefit accrual (as opposed to vesting accrual) based on prior years of service, and, under current law, Plaintiffs are still entitled to transfer funds contained in their defined contribution plan accounts (including earnings) to purchase additional benefit accrual (based on actuarial assumptions) in the defined benefits plan. And, although at least some of Plaintiffs' tort and contract claims are not so easily resolved as a matter of law, those claims turn on disputed facts, which cannot be resolved on the present record.  To the extent that Plaintiffs seek permanent relief—including an order directing that the District "expediently and with all haste take all steps necessary to ensure that Plaintiffs . . . are permitted to retire with full tier 2 retirement benefits," Dkt. 10 at 48—that resolves matters.  A plaintiff cannot obtain a permanent injunction without first prevailing on the merits of the claim at issue, and a plaintiff cannot prevail on a claim before trial where the plaintiff is wrong on the law or where material facts remain in dispute.

But even if the Court applied the more lenient likelihood of success on the merits standard, Plaintiffs would still fail—for essentially the same reasons:  Their reading of the governing retirement-benefits statutes is at odds with the plain text, and, even if some of their contract and tort claims might survive a motion to dismiss, Plaintiffs have not come close to establishing that they are likely to prevail on those fact-intensive claims.  For instance, Plaintiffs' allegations that they were not aware until 2021 that they would not receive year-for-year credit and that their savings from their contribution accounts would not transfer over are belied by

language in the 2013, 2015, and 2016 Special Orders that explicitly states that savings in employees 401(a) plans would not transfer but they could "'buy' time in the Firefighter's Plan." *See* Dkt. 39-9 at 6; Dkt. 39-10 at 6; Dkt. 39-11 at 6.  Their allegations are further contradicted by the District's May 2015 presentation, which stated explicitly that "EMS service is counted only for retirement eligibility purposes" and future annuities would be based "on service from the[ir] transition up until the date of retirement."  Dkt. 39-12 at 7.  Nor do the affidavits of Deputy Chief Jerome Stack, Dkt. 10-2 at 5–6, and former Chief Gregory Dean, Dkt. 10-2 at 20–21, on which Plaintiffs rely, support a finding that the employees were promised that they would receive year-for-year credit.  And, even if they did, Plaintiffs have yet to offer any basis for the Court to conclude that *ultra vires* statements from district personnel were binding or that the declarants' reliance on any such statements was reasonable.  *Cf. Smith v. Washington Metro. Area Transit Auth.*, No. 95-cv-687, 1997 WL 182286, at *5 (D.D.C. Apr. 4, 1997) ("[C]ourts have consistently held as a matter of law that it is unreasonable for plaintiffs to rely on oral assurances when such assurances are contradicted by written agreements to the contrary.").  As for the claim against the DCRB, Defendants correctly note that Plaintiffs have not established a fiduciary duty to fund the FRRF on behalf of the transferees, *see* Dkt. 39-1 at 51, and have not shown—as least at this early stage of the litigation—that Plaintiffs' benefit statements, which were clearly labeled as estimates, constitute legally actionable misrepresentations, *see id.* at 52.

Finally, as explained further below, the Court is not yet persuaded that it has subject-matter jurisdiction to consider Plaintiffs' D.C.-law claims.  Plaintiffs seek to invoke the Court's supplemental jurisdiction, *see* 28 U.S.C. § 1367, but to do so, they must show that their D.C.-law claims "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966), and, if they do, must then show that the factors identified in 28 U.S.C.

§ 1367(c) weigh in favor of exercising federal jurisdiction.  Because Plaintiffs bear the burden of demonstrating that they are likely to prevail on the merits of their claims, and because that burden includes establishing that the Court has jurisdiction (or likely has jurisdiction), they cannot obtain preliminary (much less permanent) relief without clearing that important hurdle. For the reasons discussed below, Plaintiffs have yet to carry that burden.

*   *   *

Because Plaintiffs have failed to carry their burden of demonstrating that they are likely to prevail on the merits (or that they are entitled to prevail on the merits as matter of summary judgment) or that they will suffer irreparable injury absent issuance of a preliminary (or permanent) injunction, the Court need not proceed further with respect to Plaintiffs' Motion for "Immediate Injunction."  Those two factors weigh most decisively in the balance, and a plaintiff who is unlikely to succeed on the merits and who will suffer no irreparable injury in the absence of injunctive relief cannot prevail.  But to the extent relevant, the Court is also convinced that the remaining factors—the balance of equities and the public interest—do not weigh in favor of an "Immediate Injunction."  Neither the equities nor the public interest factors weigh in favor of granting retirement benefits to employees who have not shown that they are entitled to those benefits, and their expectations would be frustrated were the Court to order that they receive those benefits, only to decide after Plaintiffs have retired that they are not entitled to pre-firefighter-service accrual of benefits under the defined contribution plan.

## B.      Defendants' Motion to Dismiss

The second motion before the Court is Defendants' motion to dismiss.  Dkt. 39.  Because Plaintiffs rely on supplemental jurisdiction to bring their statutory and common law claims in federal court, the Court will first consider Plaintiffs' federal-law claims and then consider

21

whether those claims provide an adequate foundation to support the Court's exercise of supplemental jurisdiction over Plaintiffs' D.C.-law claims.  Plaintiffs' federal-law claims fall into three categories:  First, Plaintiffs assert a "collective" disparate treatment claim under Section 1981 (Count XIV).  That claim alleges that the District of Columbia has deprived (seven of the eight) Plaintiffs, who transferred from the EMS to the firefighter service, of equal retirement benefits based on a legacy of racial discrimination in the firefighter service.  Second, Plaintiffs allege that the District deprived one of the Plaintiffs, Michael Timmons, of the opportunity to sit on a disciplinary trial board for firefighters because of his race, in violation of Section 1981 (Count XV).  Finally, Plaintiffs allege that the District deprived another Plaintiff, Melissa Turner, of a promotion based on her race, in violation of Section 1981 (Count XVI), and based on her race and gender, in violation of Title VII (Counts XVI & XIX).  The Court will consider each category in turn.

1.  *Collective Plaintiffs' Section 1981 Claim*

"Section 1981 protects the right 'to make and enforce contracts' free from racial discrimination."  *Nanko Shipping, USA v. Alcoa, Inc*., 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting 42 U.S.C. § 1981(a)).  A Section 1981 claim has three elements:  First, the plaintiff must allege that she is a member of the protected class.  *Id.*  Second, she must allege that she was deprived of "the enjoyment of all benefits, privileges, terms, and conditions of [a] contractual relationship."  42 U.S.C. § 1981(b); *see also Yazzie v. Nat'l Org. for Women*, 2024 WL 230244, at *9 (Jan. 22, 2024 D.D.C.).  Third, she must allege causation—that is, she must allege "that, but for [her] race, [she] would not have suffered the loss of" that benefit or privilege.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

The Court has little difficulty in concluding that the Complaint alleges facts sufficient to satisfy the first and second elements:  It alleges that—with the exception of Mark Baker, who is not a party to Plaintiffs' collective Section 1981 claim—Plaintiffs "are African American[] and [are therefore] members of a protected class," Dkt. 26 at 76 (SAC ¶¶ 533–34), and it alleges that these Plaintiffs have been denied the enjoyment of important benefits under "a contractual relationship with" the District, *id.* (SAC ¶ 535).  Plaintiffs are on much weaker ground, however, in alleging causation—*i.e.*, that they would not have suffered this loss "but for [their] race." *Comcast Corp.*, 589 U.S. at 341.

Although a Section 1981 plaintiff's "'initial burden is not onerous,'" *Wright v. Eugene & Agnes E. Meyer*, 68 F.4th 612, 622 (D.C. Cir. 2023) (citation omitted), as in any other case, the plaintiff must allege facts that, if accepted as true, would permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  For present purposes, that means that Plaintiffs must allege facts sufficient to support the reasonable inference that the District declined to provide them with FRRF credit for the time they served in the EMS because of their race.  Allegations of discriminatory intent can take one of two forms— a Section 1981 plaintiff can allege facts offering "direct evidence of discrimination" or they can allege facts supporting "'an inference of discrimination.'"  *Wright*, 461 F.4th at 622 (citation omitted).  "Threadbare recitals," "conclusory statements," and "legal conclusions," however, will not suffice.  *Iqbal*, 556 U.S. at 678.

Here, Plaintiffs' allegations fail to clear even the modest hurdle posed at the motion to dismiss stage.  They allege that the District "holds and maintains a historic and longstanding

custom[] and practice of systemic race discrimination against African Americans;" that the "Collective Plaintiffs were subjected to disparate terms and conditions of employment than their white counterparts;" that they were "denied the benefit of their work when [the District] decided not to fully fund their retirement benefits;" that, even though "non-African Americans were also affected by the decisions not to fund the FRRF, the substantial majority of those affected were African American;" that the District "did not make any decision to upset or reduce retirement benefits for the predominantly white firefighters who were not EMS transferees;" that the District chose "to ignore and abrogate its obligations under § 5-409.01 *et seq*.[] because it knew that the majority of people affected by it were African American;" and the District intentionally and knowingly targeted this adverse action "at the cadre of employees that it does not value because they are predominantly minorities." *Id.* at 77 (SAC ¶¶ 536–44).

Once the Court strips away those allegations that are too conclusory or merely assert legal conclusions, little is left.  The Complaint fails to include any "direct evidence of discrimination," and the closest it comes to alleging a factual basis for the Court to infer that they were deprived of the retroactive accrual of FRRF benefits takes the following form:  Plaintiffs allege that those District employees who started in the firefighting service started to accrue FRRF benefits from the beginning, while those who started in the EMS and then transferred to the firefighting service did not start to accrue FRRF benefits until they transferred.  And they allege that "the substantial majority of those [adversely] affected" by this different treatment "were African American."  Dkt. 26 at 77 (SAC ¶ 540).

Plaintiffs' allegations are insufficient for several reasons.  To start, Plaintiffs do not allege that they were discouraged from transferring to the firefighting service because of their race; rather, they allege that they were encouraged to transfer—and, indeed, that the Fire Chief

and "his agents" "actively encourag[ed] EMS employees, who were predominantly Black, to convert to being firefighters," *id.* at 23 (SAC ¶ 76). Nor do they bring suit challenging the District's failure to hire them as firefighters at an earlier time or for failing to provide them with a defined benefit plan during their tenure with the EMS. Rather, they challenge the District's more recent action in declining to provide transferees firefighters with FRRF credit at the time they transferred into the service. The sole support they offer for that claim, however, are vague allegations about the historic racial discrimination in D.C. Fire and Emergency Services and allegations that, due to the history of discrimination, the firefighting service is "predominantly white," while the EMS "was predominantly Black," *id.* at 16 (SAC ¶ 17). Those allegations fail for two reasons.

First, the Supreme Court has held that Section 1981 "reaches only purposeful discrimination" and, unlike Title VII, does not reach conduct that merely "results in a racially disproportionate impact." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 386, 389, 391 (1982) (citation omitted); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971). As a result, it is not enough for Plaintiffs to allege that the policy of accruing FRRF benefits only for the time spent in the firefighting service had a disparate impact on Black firefighters, even though "the substantial majority of those [adversely] affected [by that policy decision] were African American," Dkt. 26 at 77 (SAC ¶ 540). To be sure, gross statistical differences may, at times, support an inference of discriminatory intent. But that approach requires the plaintiff to make "a statistical showing that comparably qualified members of the minority group and the majority group [were] treated unequally," giving rise to a reasonable inference of "discriminatory motive." *Segar v. Smith*, 738 F.2d 1249, 1297 (D.C. Cir. 1984) (Edwards, J., concurring). But, here, Plaintiffs do not plausibly allege that the groups—that is, the transferee

and non-transferee firefighters—are similarly situated.  To the contrary, one group—the transferees—did not pay into the FRRF for the years for which Plaintiffs seek financial credit, while the other group—the non-transferees—did.  In short, Plaintiffs must allege facts sufficient to permit "the [C]ourt to draw the reasonable inference that the" District denied transferee firefighters those retroactive benefits because of their race, *Iqbal*, 556 U.S. at 678, and neither a disparate impact theory nor gross statistical disparities can relieve Plaintiffs of that requirement.

Second, with respect to that requirement—that is, pleading that the D.C. Council and Mayor, *id.* at 77 (SAC ¶ 539), acted with discriminatory intent when they failed to provide transferee firefighters with the retroactive accrual of FRRF benefits—the Complaint also comes up short.  To start, many of Plaintiffs' key allegations not only are too conclusory to suffice but also are based on the errors of law discussed above.  As discussed above, Plaintiffs' contention that the District ignored its obligations under the Transfer Amendment Act is flawed as a matter of law; nothing in the Transfer Amendment Act ever required the District to provide for the retroactive accrual of FRRF benefits.  As a result, Plaintiffs' allegation that the District ignored those obligations because "the majority of people affected by it were African Americans" does nothing to advance their claim.  *Id.* (SAC ¶ 543).

That, then, leaves Plaintiffs' allegations that there exists a history of racial discrimination in the D.C. Fire and Emergency Services dating back to the 1980s, *see, e.g.*, *id.* at 14–15, 18, 23, 77 (SAC ¶¶ 14–18, 36, 38, 80, 536–37), and that "Defendant's actions [in declining to provide retroactive accrual of benefits for transferee firefighters] were intentional, knowing and targeted at the cadre of employees that [the District] does not value because they are predominantly minorities," *id.* at 77 (SAC ¶ 544); *see also id.* at 31 (SAC ¶ 155).  But those allegations are too unrelated or conclusory to state a claim under *Iqbal* and its progeny.  In short, Plaintiffs' 637-

paragraph Complaint fails to include a single factual allegation supporting a "reasonable inference," *Iqbal*, 556 U.S. at 678, that the transferee firefighters were denied the retroactive accrual of FRRF benefits because "the substantial majority of those affected were African American," Dkt. 26 at 77 (SAC ¶ 540).

Apparently recognizing this difficulty, Plaintiffs take a different tack and argue that under the D.C. Circuit's decision in *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), they need only allege that they suffered an adverse action because of their race.  *See* Dkt. 42 at 13.  As this Court has repeatedly held, however, the *Sparrow* pleading standard is no longer controlling.  *See, e.g.*, *Jackson v. Acedo*, No. 08-cv-1941, 2009 WL 2619446, at *4 (D.D.C. Aug. 26, 2009); *Greer v. Bd. of Trs. of Univ. of D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015); *McManus v. Kelly*, 246 F. Supp. 3d 103, 111 (D.D.C. 2017); *Squires v. Gallaudet Univ.*, No. 20-cv-1348, 2021 WL 4399554, at *12 n.8 (D.D.C. Sept. 27, 2021) (collecting cases).  *Sparrow*'s permissive pleading standard was premised, at least in part, on the Supreme Court's now-outmoded decision in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which provided that a complaint should be dismissed for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal*, however, the Supreme Court "retired the *Conley* no-set-of-facts test," *Iqbal*, 556 U.S. at 670.  In its place, the Supreme Court held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotation marks and alterations omitted).

Plaintiffs argue that the "D.C. Circuit clearly applied th[e *Sparrow*] precedent in *Khatri v. Bd. of Trs. of the Univ. of Dist. of Columbia*, No. 19-cv-2644, at *21 (D.D.C. June 11, 2021)," Dkt. 42 at 13, but that statement is both factually incorrect and unavailing. *Khatri* is not an opinion from the D.C. Circuit but rather an unpublished district court opinion that referenced the old precedent without any discussion of whether it remains good law. Although the D.C. Circuit has yet to address the issue directly, its recent decisions about Section 1981 discrimination claims invoke the *Iqbal* standard and not the *Sparrow* standard. *See, e.g.*, *Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014); *Nanko*, 850 F.3d at 467. The post-*Iqbal* pleading standard is not onerous but must be met, *see Nanko*, 850 F.3d at 467, and, here, Plaintiffs have failed to do so.

The Court will, accordingly, grant Defendants' motion to dismiss as to Count XIV but will do so without prejudice. "A dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (emphasis and internal quotation marks omitted). The high standard for dismissal with prejudice is not satisfied here.

2.    *Plaintiff Timmons' Individual Section 1981 Claim*

Plaintiff Michael Timmons is a Black man who was first hired as an EMS paramedic in 1996, Dkt. 26 at 14 (SAC ¶ 4), and who was "involuntarily" transitioned to serve as a Lieutenant firefighter/paramedic in 2009, *id.* at 40 (SAC ¶¶ 231, 234). In October 2009, he was promoted to Captain. *Id.* (SAC ¶ 235). Timmons has, however, "been denied the right and responsibility to sit on disciplinary trial boards for subordinate firefighters." *Id.* at 79 (SAC ¶ 555–56). As alleged in the Complaint, the District has a policy that no transferred EMS Captains are allowed to sit on disciplinary boards, because the union, Local 36, "didn't want them there." *Id.* at 41

(SAC ¶ 245).  Timmons claims that this practice is racially discriminatory because 13 of the 30 transferee Captains are Black, *id.* (SAC ¶ 246), and because "Local 36 has a history of being predominantly white and male, and that it has been, and continues to be resistant to full and equal integration of Black and female firefighters into the service," *id.* at 41–42 (SAC ¶ 249).

Timmons' individual Section 1981 claim fails to allege a plausible claim for relief.  The Court need not decide whether the opportunity to sit on a disciplinary trial board constitutes a "benefit[], privilege[], term[], [or] condition[]" of the contractual relationship for purposes of Section 1981, because, in any event, the Complaint fails to alleged facts sufficient to support a plausible inference of intentional discrimination.  *See Comcast Corp.*, 589 U.S. at 343; *Brown*, 774 F.3d at 1022.  Timmons first argues that the Court can infer that the policy precluding transferred EMS Captains from serving on disciplinary trial boards is discriminatory because "[t]he majority of Fire Captains to whom this exclusion applies are African American."  Dkt. 26 at 79 (SAC ¶ 559).  But that allegation cannot be squared with Timmon's separate allegation that 13 of 30 of the transferee Captains are African American, *id.* at 41 (SAC ¶ 246), meaning that 17 of the 30 Captains "to whom [the] exclusion applies," *id.* at 79 (SAC ¶ 559), that is, a majority, are *not* African American.  That is a significant problem, moreover, because the Complaint fails to specify what percentage of non-transferee Captains are white, beyond referring to "the predominantly white Captains who were not transferees," *id.* (SAC ¶ 563).  Thus, Turner's own allegations fail to support even a racially disparate impact, much less a statistical disparity

sufficient to support an inference of intentional discrimination, *see Segar*, 738 F.2d at 1297 (Edwards, J., concurring).

The Court will, accordingly, grant the District's motion to dismiss as to Count XV but will do so without prejudice.  If Timmons can plead facts sufficient to support a plausible inference of discriminatory intent, the Court will provide him with the opportunity to do so.

3.     *Plaintiff Melissa Turner's Individual Section 1981, Title VII, and DCHRA Claims*

Finally, Plaintiff Melissa Turner brings claims under Section 1981, Title VII, and the D.C. Human Rights Act.  The Complaint alleges that she is a Black woman who was first hired by EMS as an EMT in 2003 and who became a certified paramedic in 2013.  *See* Dkt. 26 at 33–34 (SAC ¶ 175–78).  She transferred in 2017 to become a firefighter/paramedic.  *Id.* at 80 (SAC ¶ 574).

Melissa Turner alleges that she was twice denied a promotion: first, in 2020, when she was denied a promotion to EMS Sergeant, *id.* at 37 (SAC ¶ 210), and second, in 2022, when she was denied a promotion to firefighter Sergeant, *id.* (SAC ¶¶ 211–12).  Although the 2020 denial of promotion might provide relevant background information, Turner brings suit respecting only the second instance of alleged discrimination.  *Id.* at 81, 83, 85 (SAC ¶¶ 579, 600, 620).  She asserts claims of racial discrimination in violation of Section 1981 (Count XVI) and racial and gender discrimination in violation of Title VII (Counts XVII & XIX) and the D.C. Human Rights Act (Counts XVIII & XX).  The District addresses these counts together and argues that it had a legitimate, non-discriminatory reason for denying her the promotion—that is, it had an across-the-boards policy that required supervisors in the firefighting service to "have at least five years of firefighting service."  Dkt. 39-1 at 27–28.

Turner does not dispute that a policy roughly along those lines existed, but she maintains that policy applied to the "fire *department*" (as opposed to the "firefighting *service*"), Dkt. 26 at

38–39 (SAC ¶ 218–20), and alleges that because EMS—where she originally worked—"was subsumed into the Fire Department in 2002," *id.* at 39 (SAC ¶ 219), she easily satisfied the five-year requirement.  On Turner's telling, "Chief Donnelly created the distinction between firefighting service and EMS for the express purposes of denying promotion opportunities to African American and women firefighters," who more often than white, male firefighters started their careers in the EMS.  *Id.* (SAC ¶ 223).  She further alleges, moreover, that when she complained about her purported ineligibility for promotion and pointed out to the labor relations officer that the policy did not distinguish—within the Fire Department—between the firefighting service and the EMS, she was simply told that the Department followed "the 'intention' of the writer, rather than the plain language of the" policy.  *Id.* (SAC ¶ 221).  This misreading of the language of the policy, according to Turner, was simply pretext for discrimination.  *Id.* at 81, 83, 85 (SAC ¶¶ 577–83, 600–04, 618–24).  Finally, Turner alleges that the legitimacy of the District's proffered, non-discriminatory rationale must be evaluated in light of the other allegations in the Complaint, including allegations relating to a history of discrimination.  *Id.*

Although a close question, the Court is persuaded that Plaintiff Melissa Turner has alleged enough to clear the modest threshold for alleging a claim.  She alleges that she was as qualified as other applicants for promotion and that she was denied promotion because of her race and sex.  In response, the District proffers a legitimate, nondiscriminatory reason for refusing to promote Turner.  But Turner, in turn, has alleged facts that, if accepted as true, would support a plausible inference that the District's proffered rationale was pretextual—that is, the policy did not, in fact, bar her promotion, and when asked about the actual text of policy, the responsible official offered mere *ipse dixit*.  "In an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination.'"

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (quoting *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also Noisette v. Lew*, 211 F. Supp. 3d 73, 91

(D.D.C. 2016).  Although Turner will need more at the summary judgment stage, construing the

Complaint in the light most favorable to Plaintiffs, the Court is persuaded that Melissa Turner

has alleged enough to avoid dismissal of her individual discrimination claims.

The Court will, accordingly, deny the District's motion to dismiss as to Counts XVI,

XVII, XVIII, XIX, and XX.

4.     *Plaintiffs' Remaining D.C. Statutory and Common Law Claims*

Plaintiffs bear the burden of establishing that the Court has subject-matter jurisdiction.

*Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 188 (D.D.C. 2013).  That hurdle

is easily satisfied with respect to Plaintiffs' federal-law claims, including their claims under

Section 1981 and Title VII.  *See* 28 U.S.C. § 1331.  But Plaintiffs' burden is not so easily

satisfied with respect to their D.C.-law claims.  As to these claims, Plaintiffs seek to invoke the

Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Dkt. 26 at 15 (SAC ¶ 11).

Section 1367 provides in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are
> so related to claims in the action within such original jurisdiction that they form
> part of the same case or controversy under Article III of the United States
> Constitution.

28 U.S.C. § 1367(a).  The Court "may decline to exercise supplemental jurisdiction," however,

when "the claim raises a novel or complex issue of State law;" "the claim substantially

predominates over the claim or claims over which the district court has original jurisdiction;" the

district court has dismissed all claims over which it has original jurisdiction;" or "in exceptional

circumstances, there are other compelling reasons for declining jurisdiction."  *Id.* § 1367(c).

"Whether to retain jurisdiction over pendent . . . claims after the dismissal of the federal claims is a matter left to the sound discretion of the district court[.]"  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

Because the Court "must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge," *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018), the Court first evaluates whether it has supplemental jurisdiction before evaluating whether it should decline to exercise such jurisdiction.  To meet the constitutional and statutory minimum for supplemental jurisdiction, the pendent claims must be "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III," 28 U.S.C. § 1367—that is, the pendent and non-pendent claims must "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  "Claims derive from a 'common nucleus of operative fact' only if the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Taylor v. District of Columbia*, 626 F. Supp. 2d 25, 28 (D.D.C. 2009).  Federal courts lack supplemental jurisdiction when "there is almost no factual or legal overlap between the state and federal claims," *Chelsea Condo. Unit Owners Ass'n v. 1815 A St., Condo Grp., LLC*, 468 F. Supp. 2d 136, 141 (D.D.C. 2007), or when there is only "some background factual overlap," *Doe #1*, 554 F. Supp. 3d at 113 (quoting *Wisey's #1*, 952 F. Supp. 2d at 189).  It is not enough to plead pendent and non-pendent claims that "stem from one event" if the relevant acts that "trigger liability" are "completely separate" for the different claims.  *Taylor*, 626 F. Supp. 2d at 29; *see also Simmons v. District of Columbia*, 750 F. Supp. 2d 36, 41 (D.D.C. 2010) (holding

there was no common nucleus of operative fact where "[e]ach claim relie[d] on an independent set of facts that would require independent proof").

As an initial matter, the Court has no doubt that it has jurisdiction to consider Melissa Turner's claims of race and gender discrimination under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.*  The fact allegations supporting those claims (Counts XVIII & XX) overlap almost word-for-word with the allegations supporting Turner's Title VII claims (Counts XVII & XIX).  In short, the state-law and federal-law claims share a common nucleus of operative facts. These claims serve the central purposes of supplemental jurisdiction—avoiding the cost and inefficiency of litigating two cases that turn on the same facts—and they fit easily within the constitutional limitations.

Plaintiffs face a far steeper climb, however, in their effort to show that the Court has supplemental jurisdiction to consider their claims under D.C. Code §§ 5-409.01 & 1-704 (Counts I & II) and their array of D.C. common law contract and tort claims (Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII & XIII).  As far as the Court can discern, these claims do not meaningfully overlap with Timmons' (now dismissed) individual Section 1981 claim or with Turner's individual Section 1981 or Title VII claims.  Accordingly, if the Court has supplemental jurisdiction, it must be based on a relevant overlap between Plaintiffs' (now dismissed) collective Section 1981 claim and Counts I–XIII.

To be sure, there is "some background factual overlap" between Plaintiffs' collective Section 1981 claim and those D.C.-law claims; their Section 1981 and D.C.-law claims address Plaintiffs' (or at least most of the Plaintiffs') employment with FEMS and their right to receive retroactive credit for purposes of calculating their FRRF benefits.  But as currently pled, the facts that could, if proven, give rise to liability on Plaintiffs' collective Section 1981 claim are

separate from the facts that could, if proven, give rise to liability on most, if not all, of their state-law claims.  Most notably, Plaintiffs' collective Section 1981 claim turns on whether the District intentionally deprived most of the Plaintiffs of certain retirement benefits because of their race, while Counts I–XIII stand or fall on grounds that have nothing to do with Plaintiffs' race.  Plaintiffs allege, for example, that they were promised the retroactive accrual of FRRF benefits, Dkt. 26 at 55 (SAC ¶ 361), that they were fraudulently induced to become firefighters based on false representations that they would receive those benefits, *id.* at 61 (SAC ¶ 415), and that the D.C. Retirement Board breached its fiduciary duty to ensure that they received the benefits to which they were entitled as a matter of law, *id.* at 67 (SAC ¶ 463).  None of those claims turn on the race of the Plaintiff, and, indeed, the one white plaintiff, Mark Baker, is a party to Counts I–XIII, but not to Count XIV.  That signals what is otherwise evident—that Counts I–XIII require no evidence of racial discrimination or bias.

In response, Plaintiffs might argue the inverse: that is, to prevail on their collective Section 1981 claim, Plaintiffs will need to allege and to prove at least some facts that overlap with at least some of the facts that they will need to prove to prevail on Counts I–XIII.  Plaintiffs will likely need to demonstrate, for example, that they served as EMTs for many years before becoming firefighters and that they paid funds into the defined contribution plan during those early years.  But Plaintiffs never address whether and how those uncontested, background allegations are sufficient to sustain supplemental jurisdiction, and, more generally, they never develop their jurisdictional argument in any meaningful away.  Indeed, they barely address the issue, *see* Dkt. 42 at 25, and simply assert in a footnote that their DCRB claims "clearly derive from a common nucleus of operative facts as [their] Section 1981 claims" because both sets of claims allege "that predominately Black single role EMS employees who became firefighters

were denied the same DB Plan account funding as predominately white firefighters," *id.* at 54

n.4.  That *ipse dixit* is far from sufficient to carry Plaintiffs' burden of establishing jurisdiction,

particularly given the lack of clarity regarding the nature of Plaintiffs' collective Section 1981

claim.

But even if the Court were to assume that some minimal overlap of "operative facts"

exists, the Court is unpersuaded that this is a case that would warrant the exercise of the Court's

discretion to retain jurisdiction over Plaintiffs' D.C.-law claims.  Among other things, Plaintiffs'

dozen-plus D.C.-law claims "substantially predominate[] over" their perplexing collective

Section 1981 claim,[3] which the Court has dismissed, and their D.C.-law claims "raise novel or

complex issues of State law," principally relating to whether and when the District government

can be bound by promises or representations made by government officials or included in

government-issued documents.  28 U.S.C. § 1367(c).  "[P]endent jurisdiction is a doctrine of

discretion, not of plaintiff's right," and the Court should consider "judicial economy,

convenience and fairness to litigants" before exercising jurisdiction over state claims.  *Gibbs*,

383 U.S. at 726.

As a result, the Court doubts that it has supplemental jurisdiction and, in any event,

Plaintiffs have failed to carry their burden of demonstrating that the Court either has

---

[3]  Among other oddities, it is far from clear what purpose the claim serves, other than providing
an arguable hook for supplemental jurisdiction.  To the extent Plaintiffs claim that they were
legally entitled to the benefits at issue and were denied that legal right because of their race,
Plaintiffs never explain why they need to prove an improper motivation to recover; one would
think that merely proving entitlement to the benefits would suffice, without requiring that
Plaintiff take on the additional burden of proving that the District acted for discriminatory
reasons.  And, in the alternative, to the extent Plaintiffs contend that they were not legally
entitled to the benefits but that they District deprived them of a discretionary benefit—or failed
to seek legal authority to provide them with the benefit—because of their race, the Court fails to
see how that claim shares a "common nucleus of operative facts" with the preceding claims,
which assert that Plaintiffs were legally entitled to receive the benefits at issue.

supplemental jurisdiction or should exercise its discretion to retain jurisdiction.  The Court will, accordingly, dismiss Plaintiffs' D.C.-law claims in Counts I–XIII pursuant to Section 1367(c), but will do so without prejudice.  If Plaintiffs can replead their collective Section 1981 claim in a manner that is sufficient to state a claim—and in a manner that implicates a "common nucleus of operative facts" with the claims asserted in Counts I–XIII, the Court will reconsider whether to exercise supplemental jurisdiction over those state-law claims.  Plaintiffs are cautioned, however, that they have a steep hill to climb and that to the extent they seek a prompt resolution of their state-law claims, the more efficient path may be to refile in D.C. Superior Court.  *Cf. Saud v. DePaul Univ.*, No. 19-cv-3945, 2019 WL 5577239, at *7 (N.D. Ill. Oct. 29, 2019) (holding that plaintiff's contract claims did not share a common nucleus of operative fact with his section 1981 claim); *Doe v. United States*, No. 20-cv-3553, 2022 WL 14760938, at *6 (D.D.C. Oct. 25, 2022) (holding there was no common nucleus between plaintiff's discriminatory termination claims and other tort claims); *Smith v. Reynolds & Assocs., Inc.*, No. 23-cv-1582, 2024 WL 2273589, at *4 (D.D.C. Mar. 3, 2024) (holding there was no common nucleus of operative fact between Title VII and ADA claims and defamation and IIED claims).

The Court will, accordingly, dismiss Counts I through XIII without prejudice.

## C.    Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Discovery

Defendants move, in the alternative, for summary judgment on six of Plaintiffs' common law claims: Counts III–IV, Dkt. 39-1 at 34–39, Count V, *id.* at 39–41, Count VI, *id.* at 41–42, Count VIII, *id.* at 44–45, Count X, *id.* at 47–48.  The Court has now dismissed all six of those claims, *see supra* Part II(B), rendering that motion moot.  Plaintiffs' motion for discovery pursuant to Federal Rule of Civil Procedure 56(d) in order to respond to Defendants' motion for summary judgment, Dkt. 41, is likewise moot.

**D.       Plaintiffs' Motion to Strike**

Plaintiffs, in turn, move pursuant to Federal Rule of Civil Procedure 12(f) to strike

Defendants' Notice Regarding Plaintiffs' Reply in Support of Their Rule 56(d) Motion to Seek

Discovery, Dkt. 50, arguing that this three-sentence "Notice" constitutes an unauthorized sur-

reply.  Dkt. 51.  Courts are divided on whether Rule 12(f), which applies to striking material

"from a pleading," extends to filings other than "pleadings."  *Compare Hildebrandt v. Veneman*,

233 F.R.D. 183, 184 n.1 (D.D.C. 2005) (explaining that courts occasionally apply Rule 12(f) to

non-pleadings); *with Ahuruonye v. U.S. Dep't of Int.*, 312 F. Supp. 3d 1, 10 (D.D.C. 2018)

(holding that Rule 12(f) does not apply); *Skull Valley Band of Goshute Indians v. Kempthorne*,

No. 04-cv-339, 2007 WL 915211, at *7 (D.D.C. Mar. 26, 2007) (same).  In any event, the Court

concludes that Rule 12(f) is inapplicable because Defendants' Notice does not set forth "an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

Civ. P. 12(f).  The Notice merely states for clarity of the record that "Defendants did not—and

do not—make any . . . concession" with respect to "the factual accuracy of Plaintiffs' allegations

regarding statements by District officials."  Dkt. 50 at 1.  And, more importantly, the Court sees

no reason to disallow Defendants' filing, which merely clarifies the record for the Court in a

succinct and non-argumentative manner.  Perhaps Defendants should have filed a motion for

leave to file, along with their Notice, but Plaintiffs identify no prejudice that they have suffered

due to Defendants' clarification.

The Court, accordingly, denies Plaintiffs' Motion to Strike, Dkt. 51.

**E.       Plaintiffs' Motion for Enlargement of Time to Move for Class Certification**

Plaintiffs seek to bring claims on behalf of themselves and similarly situated D.C. FEMS

employees.  Dkt. 1 at 33; Dkt. 13 at 53; Dkt. 26 at 53.  Pursuant to this Court's Local Rules:

> Within 90 days after the filing of a complaint in a case sought to be maintained as a class action, unless the Court in the exercise of its discretion has extended this period, the plaintiff shall move for a certification under Fed. R. Civ. P. 23(c)(1), that the case may be so maintained.

L. Civ. R. 23.1(b).  Judges in this district have held that the "ninety-day limitations period begins to run from the filing of the original complaint and not any later amended complaint." *Cryer v. InterSolutions, Inc.*, No. 06-cv-2032, 2007 WL 1191928, at *5 (D.D.C. Apr. 20, 2007); *see also Howard v. Gutierrez*, 474 F. Supp. 2d 41, 54–55 (D.D.C. 2007).  Plaintiffs acknowledge that they did not timely move for class certification within 90 days of the filing of their original Complaint. Dkt. 57-1 at 1.  Plaintiffs, accordingly, ask the Court to exercise its discretion and grant Plaintiffs an enlargement of time in which to move for class certification.  Dkt. 57.  Defendants oppose any extension of time.  Dkt. 58.

The Court may extend the time for Plaintiffs to move for class certification if Plaintiffs "failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1).  That determination "is at bottom an equitable one" that should consider "the danger of prejudice to the [other party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).  Here, almost eight months ran from the time that Plaintiffs should have filed for class certification and when they sought an extension of time to do so.  Notwithstanding that delay, however, Defendants have suffered no meaningful prejudice, the delay has had little or no effect on the proceedings, and there is no reason to believe that Plaintiffs have acted in bad faith or to obtain a strategic advantage of some type.  "Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to

omissions caused by circumstances beyond the control of the movant." *Pioneer*, 507 U.S. at 392. The reason for delay is merely one factor in the multifactor assessment.

Defendants argue that Plaintiffs acted in bad faith because at least 25 days elapsed from when Plaintiffs learned that they missed the deadline and when Plaintiffs filed their motion for an extension of time. Dkt. 58 at 8. In response, Plaintiffs explain this delay as "the time it took for Plaintiffs to research, draft and file" this motion given "their already existing and significant litigation commitments." Dkt. 59 at 4. Viewed in this light, the Court concludes that a three-week delay—albeit less attentive than ideal—does not itself establish bad faith or a disregard for the Court's rules. It is a far cry from the three months that plaintiffs in *Howard*, 474 F. Supp. 2d at 57, waited before filing a motion for an extension of time.

The other *Pioneer* factors weigh in favor of a finding of excusable neglect. Defendants have been on notice since the original complaint that Plaintiffs intend to file for class certification. Dkt. 1 at 41–47 (Compl. ¶¶ 286–325); *cf. Cryer*, 2007 WL 1191928, at *6 (concluding that such notice weighs in favor of finding excusable neglect). The parties agree that this case is in its "early, pre-discovery stages, with pending motions that could affect some or all of the individuals Defendants know are members of the putative class." Dkt. 59 at 4; *see also* Dkt. 58 at 6. Defendants moved for dismissal of all of Plaintiffs' claims before the 90-day period elapsed, *see* Dkt. 20, they renewed that motion in response to the second amended complaint, *see* Dkt. 39, and the Court had yet to decide the motion to dismiss when Plaintiffs filed their motion for extension of time. "[E]ven if the plaintiffs had filed their motion for extension of time for class certification prior to the expiration of the ninety-day period, the Court still would have had to resolve \defendants' motion to dismiss prior to setting any schedule for the filing of briefs on class certification." *Cryer*, 2007 WL 1191928, at *6. Defendants offer no

reason why the progress of the case so far would have been different had Plaintiffs timely filed their motion for class certification.  Unlike the Court in *Howard*, 474 F. Supp. 2d at 56, the Court sees no reason—and Defendants have not offered one—why any uncertainty in the scope of the class in this matter has prejudiced Defendants.  This is particularly true given that the Court would not have yet decided any motion for class certification, even if one had been timely filed, and because, as of this opinion, the class claims have been dismissed.

The Court, accordingly, grants Plaintiffs' motion for enlargement of time, Dkt. 57, and orders Plaintiffs to move for class certification within 90 days of the filing of a third amended complaint, if any.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for "an immediate injunction," Dkt. 10, is hereby **DENIED**.  Defendants' motion to dismiss, Dkt. 39, is **GRANTED** as to Counts I–XV and **DENIED** as to Counts XVI–XX.  Counts I–XV are **DISMISSED** without prejudice, and Plaintiffs may file a third amended complaint on or before July 15, 2024.  Defendants' motion in the alternative for partial summary judgment, Dkt. 39, is **DENIED** as moot.  Plaintiffs' motion for discovery, Dkt. 41, is also **DENIED** as moot.  Plaintiffs' motion to strike, Dkt. 51, is **DENIED**.  Plaintiffs' motion for an enlargement of time to move for class certification, Dkt. 57, is **GRANTED**, and Plaintiffs shall move for class certification within 90 days of the filing of a third amended complaint, if any.

If Plaintiffs elect to file a third amended complaint, they shall ensure that the complaint adheres to the legal conclusions set forth in this opinion and does not include any claims lacking a good faith basis in light of those conclusions.  If Plaintiffs, instead, decide to pursue Melissa Turner's claims in this case and to litigate their D.C.-law claims in Superior Court, where

jurisdiction is far less uncertain, they shall file a status report with the Court on or before July 15, 2024, notifying the Court and Defendants of that decision.

      **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  June 26, 2024